**[J-12-2018]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 40 MAP 2017 |
| | : | |
| Appellee | : | Appeal from the Order of the Superior |
| | : | Court at No. 296 MDA 2016 dated |
| | : | December 05, 2016, Reconsideration |
| v. | : | denied February 9, 2017, Affirming the |
| | : | Judgment of Sentence of the Court of |
| | : | Common Pleas of Cumberland |
| ASHLEY LAUREN WILMER, | : | County, Criminal Division, at No. CP- |
| | : | 21-CR-0003487-2013, dated February |
| Appellant | : | 16, 2016 |
| | : | |
| | : | ARGUED:  May 15, 2018 |

**OPINION**

**JUSTICE DONOHUE**                               **DECIDED:  September 21, 2018**

Absent a recognized exception, under the Fourth Amendment to the United States Constitution[1] it is axiomatic that a law enforcement officer may not make a warrantless entry into a private dwelling.  One such exception to the warrant requirement is the "emergency aid exception," which this Court has characterized as belonging to a broader group of exceptions justified by the "community caretaking doctrine."  *Commonwealth v. Livingstone*, 174 A.3d 609, 627 (Pa. 2017).  Pursuant to the community caretaking doctrine, certain warrantless actions of police officers do not offend constitutional

---

[1] Wilmer has also cited to Article I, Section 8 of the Pennsylvania Constitution in support of her suppression claim.  She does not, however, contend that Article I, Section 8 provides any more extensive protections than does the Fourth Amendment, and thus we need not address whether they are coextensive in the present context.

principles because they are motivated by a "desire to render aid or assistance, rather than the investigation of criminal activity." *Id.* at 627. In this discretionary appeal, we consider whether a police officer who properly entered a residence to render emergency aid could, after the emergency had passed, thereafter reenter the dwelling to perform administrative tasks in follow-up to the emergency entrance. For the following reasons, we conclude that the emergency aid exception did not permit reentry after the emergency had dissipated

On October 27, 2013, while on foot patrol in Shippensburg, Pennsylvania, Pennsylvania State Troopers Smolleck and Shoap (the "Troopers") observed a number of people on the roof of a sorority house's porch. N.T., 7/6/2015, at 7. One of these people, a young man, appeared to be visibly intoxicated and unsteadily stumbling around on the roof. *Id.* at 8. The Troopers feared that this individual would fall off the roof and injure himself, and so they approached the front door and sought permission to enter, but the occupants refused their requests. *Id.* at 8-10. Trooper Shoap tried, unsuccessfully, to kick the door open, and those inside laughed at his inability to do so. *Id.* at 10. He then kicked through the window next to the door and reached in and unlocked it. *Id.* at 11. The Troopers called fire, EMS, and the Shippensburg Borough Police to the scene to assist in the matter. *Id.* at 9. To gain access to the roof on the second floor, the Troopers removed an air conditioning unit from a window, potentially damaging it. *Id.* at 11. By the time the Troopers gained access to the roof, the young man had fallen and was being treated by first responders on the ground. *Id.* at 12.

As the Troopers exited the house, Trooper Smolleck saw a bag of marijuana and a marijuana grinder on a coffee table, which he seized and took to his patrol vehicle.[2] *Id.* at 11. Trooper Smolleck testified that he then reentered the sorority house to obtain information to complete a report that he intended to file regarding the broken window and air conditioner. *Id.* at 13. Upon reentry, he knocked on a closed bedroom door. *Id.* at 14. The door opened, and Appellant Ashley Wilmer ("Wilmer") raised her hand when Trooper Smolleck asked the six young women inside if any of them were residents of the house. *Id.* at 14. While Wilmer was providing Trooper Smolleck with her name and other requested information, he observed a glass marijuana bong and a pipe sitting in plain view on a nightstand next to Wilmer. *Id.* at 15. Wilmer admitted that the items belonged to her and she was subsequently charged with one count of possession of drug paraphernalia, 35 P.S. § 780-113(a)(32).

On May 15, 2015, Wilmer filed a motion to suppress the evidence, challenging the lawfulness of the Troopers' initial entry and Trooper Smolleck's reentry into the sorority house without consent, a warrant, or probable cause and exigent circumstances. Following the hearing, the trial court denied Wilmer's motion to suppress. N.T., 7/6/2015, at 35. In its subsequent written opinion pursuant to Rule 1925(a) of the Pennsylvania Rules of Appellate Procedure, the trial court concluded that the Troopers' original entry was justified by their "good faith belief that the young man was in imminent danger of injury or death[,]" and that Trooper Smolleck's reentry into the home was justified by "the exigent circumstances that gave rise to the original entry." Trial Court Opinion, 4/19/2016, at 4. The trial court further reasoned that because the damage was caused in the course

---

[2] No charges resulted from the seizure of these items.

of the initial entry, a second entry was needed "to establish the identity of the residents of the house to file an incident report." *Id.* Because Trooper Smolleck was lawfully present in the residence when he observed the drug paraphernalia in plain view, the trial court determined that the evidence was not subject to suppression. *Id.* On February 16, 2016, Wilmer's case proceeded to a stipulated nonjury trial, at which the trial court found Wilmer guilty and sentenced her to pay the costs of prosecution and a fifty dollar fine.

On appeal to the Superior Court, Wilmer again challenged the legality of both the Troopers' initial entry and Trooper Smolleck's reentry into the house. Concerning the initial entry, Wilmer asserted "there was no evidence that the [intoxicated] individual actually needed emergency aid or that he requested assistance from the Troopers." *Commonwealth v. Wilmer*, 296 MDA 2016 at 4-5 (Pa. Super. Dec. 5, 2016) (unpublished memorandum). The Superior Court rejected this argument, stating that "police will be excused from compliance with the warrant and probable cause requirements of the Fourth Amendment … when the police reasonably believe that someone within a residence is in need of immediate aid." *Id.* at 5-6 (citing *Commonwealth v. Potts*, 73 A.3d 1275, 1280-81 (Pa. Super. 2013)). The panel concluded that "[i]n light of the totality of the circumstances, [the initial] police entry to the sorority house was reasonable under the circumstances." *Id.* at 8.

With respect to Trooper Smolleck's reentry of the sorority house, the Superior Court affirmed the trial court's denial of suppression on the grounds that it was "entirely reasonable" for Trooper Smolleck to reenter to obtain information for his incident report and because Trooper Smolleck's reentry was "merely part of one continuous episode, initially justified by exigent circumstances." *Id.* at 10. The Superior Court explained that

"when police are properly authorized to enter a dwelling under the exigent circumstances doctrine,[3] they are also authorized to return to complete the necessary paperwork required by the emergency situation that allowed them to enter the building in the first place." *Id.* The Superior Court further stated that "there is no … rule that prohibits an officer, legitimately on the premises, from returning to the residence to perform the police functions which are then immediately justified and required." *Id.* Finally, the court observed that as to the reentry, "[t]here was no unwarranted delay in time, nor was there any purposeful search," but rather, "[t]he items taken into the custody of police were in plain view as the trooper completed his report." *Id.*

We granted allowance of appeal solely to consider the legality of Trooper Smolleck's reentry into the residence[4] after the emergency that supported the Troopers' initial entry had dissipated. Our review of an order denying a motion to suppress is limited:

> We may consider only the Commonwealth's evidence and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the factual findings of the trial court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error.

*Commonwealth v. Russo,* 934 A.2d 1199, 1203 (Pa. 2007) (citations omitted). As an appellate court, we are not bound by the suppression court's conclusions of law; rather,

---

[3] In this instance, the Superior Court conflated the exigent circumstances exception, pursuant to which the police are searching for and/or attempting to preserve evidence, with the emergency aid doctrine, pursuant to which the police, as part of their community caretaking function, assist an occupant of a private dwelling who is in need of immediate assistance. *See Livingstone*, 174 A.3d at 627 n.12.

[4] In her petition for allowance of appeal, Wilmer sought review of both the Troopers' original entry into the sorority house and Trooper Smolleck's subsequent reentry. This Court limited its grant of allocatur to the issue of Trooper Smolleck's reentry.

when reviewing questions of law, our standard of review is de novo and our scope of review is plenary. *Id.*

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

Under the Fourth Amendment, "searches and seizures without a warrant are presumptively unreasonable," subject only to specifically established exceptions. *Katz v. United States,* 389 U.S. 347, 357 (1967); *Birchfield v. North Dakota*, — U.S. —, 136 S.Ct. 2160, 2173 (2016); *Arizona v. Hicks*, 480 U.S. 321, 327 (1987); *Commonwealth v. Roland*, 637 A.2d 269, 270 (Pa. 1994). These exceptions include, *inter alia*, exigent circumstances,[5] the "plain view" exception,[6] searches incident to arrest,[7] consent

---

[5] *See Kentucky v. King*, 563 U.S. 452, 462 (2011) ("Where, as here, the police did not create the exigency by engaging or threatening to engage in conduct that violates the Fourth Amendment, warrantless entry to prevent the destruction of evidence is reasonable and thus allowed.").

[6] *See Horton v. California*, 496 U.S. 128, 136 (1990) ("It is ... an essential predicate to any valid warrantless seizure of incriminating evidence that the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed.").

[7] *See United States v. Robinson*, 414 U.S. 218, 226 (1973) ("'When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. … In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction.").

searches,[8] and automobile searches.[9]  A police officer may also briefly detain a person without a warrant or probable cause, so long as the officer possesses a reasonable suspicion that the individual is or is about to be engaged in criminal activity.  *United States v. Cortez*, 449 U.S. 411 (1981); *Terry v. Ohio*, 392 U.S. 1 (1968).

While the foregoing examples of exceptions to the warrant requirement were developed to address circumstances arising in the context of law enforcement, courts have recognized that law enforcement officers legitimately perform community caretaking activities that also necessitate exceptions to the warrant requirement.  The "community caretaking doctrine" has its roots in *Cady v. Dombrowski*, 413 U.S. 433 (1973), wherein the United States Supreme Court recognized that, in addition to law enforcement, police legitimately perform community caretaking functions.  *Id.* at 441.  *Cady* involved an inventory search of a disabled automobile in a police officer's attempt to locate a gun so as to "protect the public from the possibility that a revolver would fall into untrained or perhaps malicious hands."  *Id.* at 443.  The Court described the police officer's actions as "community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute."  *Id.* at 441.

In our recent decision in *Livingstone*, this Court observed that the community caretaking doctrine encompasses three specific exceptions to the Fourth Amendment's

---

[8]  *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) ("[O]ne of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent.").

[9]  *See California v. Carney*, 471 U.S. 386 (1985) (stating that the automobile exception applies "[w]hen a vehicle is being used on the highways, or if it is readily capable of such use and is found stationary in a place not regularly used for residential purposes-temporary or otherwise… .").

warrant requirement: the public servant exception,[10] the automotive impoundment/inventory exception,[11] and the emergency aid exception. *Livingstone*, 174 A.3d at 626-27. These three exceptions share a common underpinning, namely that police officers engage in a wide variety of activities relating to the health and safety of citizens unrelated to the detection, investigation and prevention of criminal activity. *Livingstone*, 174 A.3d at 627 (citing, e.g., *State v. Ryon*, 108 P.3d 1032, 1043 (N.M. 2005) (under the community caretaking doctrine, "intrusion upon privacy occurs while police are acting as community caretakers; their actions are motivated by 'a desire to aid victims rather than investigate criminals.' ")). We also stressed in *Livingstone*, however, that

---

[10] In *Livingstone*, we defined the public servant exception as follows:

> [I]n order for a seizure to be justified under the public servant exception to the warrant requirement under the community caretaking doctrine, the officer must point to specific, objective, and articulable facts which would reasonably suggest to an experienced officer that assistance was needed; the police action must be independent from the detection, investigation, and acquisition of criminal evidence; and, based on a consideration of the surrounding circumstances, the action taken by police must be tailored to rendering assistance or mitigating the peril. Once assistance has been provided or the peril mitigated, further police action will be evaluated under traditional Fourth Amendment jurisprudence.

*Livingstone*, 174 A.3d at 637.

[11] In *Commonwealth v. Lagenella*, 83 A.3d 94 (Pa. 2013), this Court provided the following description of inventory searches:

> In determining whether a proper inventory search has occurred, the first inquiry is whether the police have lawfully impounded the automobile, i.e., have lawful custody of the automobile. … The second inquiry is whether the police have conducted a reasonable inventory search. An inventory search is reasonable if it is conducted pursuant to reasonable standard police procedures and in good faith and not for the sole purpose of investigation.

*Id.* at 102.

while community caretaking activities are laudable endeavors, they must be performed strictly in accordance with Fourth Amendment protections. *Id.* at 629.

The exception at issue here is the emergency aid exception. We must determine the permissible scope of warrantless intrusions pursuant to this exception and decide whether Trooper Smolleck, by reentering the sorority house after the emergency that justified his initial entry had dissipated, exceeded the scope of the exception. The seminal case on the emergency aid exception, in which the Supreme Court first recognized it as an exception to the Fourth Amendment's warrant requirement and established limitations on its permissible scope, is *Mincey v. Arizona*, 437 U.S. 385 (1978). In *Mincey*, an undercover police officer (Officer Headricks) arranged to buy heroin at Mincey's Tucson, Arizona apartment. *Id.* at 387. As he approached the door of the apartment, Officer Headricks was accompanied by nine plainclothes narcotics officers and a deputy county attorney. *Id.* John Hodgman, one of Mincey's three associates in the apartment, opened the door and Officer Headricks rushed in and quickly moved to the bedroom. *Id.* Hodgman tried to prevent the narcotics officers from gaining entry to the apartment by attempting to slam the door, but he was unsuccessful. *Id.* As they entered, the narcotics officers heard shots from the bedroom, and Officer Headricks soon emerged and collapsed on the floor (he died hours later). *Id.* When the narcotics officers entered the bedroom, they found a wounded Mincey lying on the floor. *Id.*

Thinking that there may be other shooting victims, the narcotics officers did a quick search of the apartment for this purpose. *Id.* at 388. They found a young woman wounded in the bedroom and one of Mincey's associates in the living room (who had been shot in the head). *Id.* The narcotics officers provided some medical assistance to

Officer Headricks but, pursuant to a police department policy that officers should not investigate incidents in which they were involved, did not search for or seize any evidence. *Id.* Within ten minutes, however, homicide detectives, having been alerted by a radio report, arrived at the scene and, after removing Officer Headricks and the suspects, began an exhaustive four-day search, gathering evidence as they examined and inventoried every item in the apartment. *Id.* at 388-89. The homicide detectives did not obtain a search warrant. *Id.* at 289.

On appeal, the Arizona Supreme Court affirmed the suppression court's denial of Mincey's motion to dismiss. In its opinion, the court held that a "murder scene exception" to the Fourth Amendment's warrant requirement justified the homicide detectives' lengthy warrantless search. *Id.* at 389. The court placed two limitations on its proposed exception: the search must be narrowly tailored to determining the "circumstances of death" and it must begin within a reasonable period following the time when the police learn of the murder (or potential murder). *Id.* at 390.

The United States Supreme Court reversed, refusing to recognize a "murder scene exception" to the Fourth Amendment. In so doing, it rejected four arguments advanced by the state in support of the exception: that Mincey forfeited any reasonable expectation of privacy in his apartment by shooting Officer Headricks; that a murder presents an emergency situation demanding immediate action; that the public has a vital public interest in the serious crime of murder; and that it is constitutionally permissible because it would be narrowly confined by the limitations established by the Arizona Supreme Court. *Id.* at 391-95.

Relevant for present purposes is the Court's response to the state's argument that that a murder presents an emergency situation demanding immediate warrantless action. In rejecting this argument, the Court viewed the facts of the case as presenting two distinct searches: the first by the narcotics officers looking for other shooting victims and the second by the homicide detectives who arrived ten minutes later and conducted a four-day search of the contents of the apartment while collecting evidence. The Court found that the first search did not violate the Fourth Amendment. To the contrary, the Court indicated that "we do not question the right of the police to respond to emergency situations."[12] *Id.* at 392. Providing further elaboration, the Court stated:

> Numerous state and federal cases have recognized that the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe[13] that a person within is in need of immediate aid. Similarly, when the police come upon the scene of a homicide they may make a prompt warrantless search of the area to see if there are other victims or if a killer is still on the premises. *Cf. Michigan v. Tyler,* 436 U.S. [499, 509–510 (1978)]. "The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent

---

[12] Although not specifically characterizing it as the "emergency aid exception," this Court has on several occasions recognized that a warrantless entry into a private residence will not offend constitutional principles if the police officers "reasonably believe that a person within is in need of immediate aid." *Commonwealth v. Davido*, 106 A.3d 611, 623 (Pa. 2014); *see also Commonwealth v. Galvin*, 985 A.2d 783, 795 (Pa. 2009); *Commonwealth v. Miller*, 724 A.2d 895, 900 (Pa. 1999); *Commonwealth v. Silo*, 502 A.2d 173, 175 (Pa. 1985); *Commonwealth v. Maxwell*, 477 A.2d 1309, 1315 (Pa. 1984); *Commonwealth v. Norris*, 446 A.2d 246, 248 (Pa. 1982).

[13] In a subsequent case, *Brigham City v. Stuart*, 547 U.S. 398 (2006), the Court clarified that the reasonableness of the police officer's belief is assessed on an objective, rather than subjective, basis. *Id.* at 404-05 ("[A]n action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, as long as the circumstances, viewed objectively, justify [the] action."); *see also Michigan v. Fisher*, 558 U.S. 45, 47 (2009) ("This emergency aid exception [requires only] an objectively reasonable basis for believing [that] a person within [the house] is in need of immediate aid[.]").

an exigency or emergency." *Wayne v. United States*, [318 F.2d 205, 212 (D.C. Cir. 1963)] (opinion of Burger, J.).

*Id.* at 392-93 (footnotes omitted).

The Court did take issue, however, with the second search of the apartment by the homicide detectives, which occurred after the emergency had abated and the shooting victims had been located. It found that while the emergency created by the shooting provided justification "for what would be otherwise illegal" (i.e., the first search), it did not justify an open-ended exhaustive search of Mincey's apartment without a warrant for evidence. Instead, the Court made clear that a warrantless intrusion pursuant to the emergency aid exception must be commensurate with, and limited to, the perceived need to provide immediate assistance. Specifically, the Court held that

> a warrantless search must be **"strictly circumscribed by the exigencies which justify its initiation**," *Terry v. Ohio*, 392 U.S. at 25-26, 88 S.Ct. at 1882, and it simply cannot be contended that this search was justified by any emergency threatening life or limb. All the persons in Mincey's apartment had been located before the investigating homicide officers arrived there and began their search. And a four-day search that included opening dresser drawers and ripping up carpets can hardly be rationalized in terms of the legitimate concerns that justify an emergency search.

*Id.* at 393 (emphasis added).

In determining whether Trooper Smolleck's reentry into the sorority house was "strictly circumscribed" by the nature of the emergency justifying his initial entry, we turn first to Professor Wayne LaFave's treatise on search and seizure law, in which he offers the following useful explanation of this phrase:

> A warrantless search must be strictly circumscribed by the exigencies which justify its initiation. As to what may be done by the police or other public authorities once they are inside the premises, this must be assessed upon a case-by-case

> basis, taking into account the type of emergency which appeared to be present....  The officer's post-entry conduct must be carefully limited to achieving the objective which justified the entry - **the officer may do no more than is reasonably necessary to ascertain whether someone is in need of assistance and to provide that assistance.**

3 Wayne R. LaFave, Search and Seizure § 6.6(a) (5th ed. 2012) (emphasis added) (footnotes and internal quotation marks omitted).  Professor LaFave further amplifies that "[o]nce it is determined that the suspicion which led to the entry is without substance, the officers must depart rather than explore the premises further." *Id.*

In other words, the right of entry into the private dwelling by law enforcement officers terminates when either the necessary emergency assistance has been provided or it has been confirmed that no one inside needs emergency assistance.  At that point, law enforcement officers must **leave the residence** unless some other exception to the warrant requirement permits their continued presence.  *See Livingstone*, 174 A.3d at 637 ("Once assistance has been provided or the peril mitigated, further police action will be evaluated under traditional Fourth Amendment jurisprudence.").  Multiple courts in other jurisdictions have so ruled.  In *U.S. v. Goldenstein*, 456 F.2d 1006 (8th Cir. 1972), for example, police received a report of a violent fight in a hotel, and one of the participants (Goldenstein) was reportedly seen going to his room carrying a gun and appearing to be seriously wounded.  *Id.* at 1010.  A police officer immediately went to the room, but Goldenstein was not there.  *Id.*  Spotting a bloody shirt on the bed, however, the officer conducted a thorough search of the entire room, including a closed suitcase that contained money from a recent bank robbery.  *Id.*  The Eighth Circuit Court of Appeals ruled that the officer's original entry into the hotel room was justified pursuant to the emergency aid doctrine, but once the officer satisfied himself that Goldenstein was not in

the room, he had no constitutional authority to remain and search. *Id.* The room should instead have been secured and a warrant obtained before conducting any subsequent searches. *Id.*

Similarly, in *State v. Neighbors*, 328 P.3d 1081 (Kan. 2014), the Supreme Court of Kansas addressed a circumstance in which a landlord used his key to enter an apartment to confront the tenant over past due rent. *Id.* at 1084. Finding an unresponsive male (Neighbors, who was not the tenant) lying on the couch, the landlord called 911. *Id.* The police officers responding to the call entered and attempted to revive Neighbors. *Id.* They were eventually successful in waking him and he required no further medical treatment. *Id.* Rather than leave, however, the officers began questioning Neighbors about the landlord's suspicions that he was trespassing. *Id.* While this questioning was taking place, a narcotics investigator heard Neighbors' name on the police radio. *Id.* With knowledge that Neighbors was a repeat drug offender, the investigator came to the apartment and, upon entry, observed evidence of methamphetamine use. *Id.* at 1084-85. Obtaining Neighbors' consent to search his clothing, the investigator found a small bag of methamphetamines. *Id.* at 1085.

The Supreme Court of Kansas reversed the decisions of the lower courts denying Neighbors' suppression motion. The court ruled that the police officers' actions were not "strictly circumscribed" by the nature of the emergency justifying the intrusion, since investigation of the landlord's trespass contentions exceeded the scope of the limited emergency.

> [L]ike the homicide detectives' apartment search in *Mincey* and the suitcase search in *Goldenstein*, the trespass investigation was wholly unrelated to the perceived medical emergency. The emergency aid exception could not be

> invoked as a basis for validating the trespass investigation. **The responding officers were required to leave the apartment once it was clear the occupants did not need medical assistance.**

*Id.* at 1093 (emphasis added). The court further ruled that the state could not rely upon a medical emergency to invoke the emergency aid exception to validate the narcotics investigator's entry in the apartment and subsequent investigation. *Id.; see also Commonwealth v. Peters*, 905 N.E.2d 1111 (Mass. 2009) (after entry of premises where gun fired revealed no victim or evidence of imminent danger, a second "protective sweep" required suppression); *State v. Geisler*, 610 A.2d 1225 (Conn. 1992) (even if police entry to give emergency aid was lawful, "once they ascertained that he was physically well they should have withdrawn"); *State v. Cota*, 675 P.2d 1101 (Or. 1984) (entry based upon a concern for the safety of child should have been terminated when the police learned that the child's father was in the home); *United States v. Brand*, 556 F.2d 1312 (5th Cir. 1977) (officer properly entered to assist with overdose victim, but search of another room after victim was removed was improper).

Applying the principles in *Mincey* to the facts of record in the case at bar, we assume for purposes of this appeal that the Troopers' initial warrantless entry into the sorority house did not violate the Fourth Amendment's warrant requirement, as they had an objectively reasonable basis to believe that an occupant was in need of emergency assistance. The evidence established that the Troopers observed a visibly intoxicated young man stumbling around on the roof, and they reasonably believed that he was in danger of falling. Upon gaining access to the roof, however, the Troopers learned that the young man had fallen and was being treated by first responders on the ground. At that time, the Troopers' authority for a warrantless entry into the house **ceased**, and in

accordance with *Mincey*'s teaching that the right of entry be "strictly circumscribed" by the nature of the emergency justifying the intrusion, the Troopers were required to **leave** the premises immediately. While they did so, Trooper Smolleck then reentered the residence. The emergency having passed, the emergency aid exception did not support Trooper Smolleck's reentry. As the Commonwealth does not claim that any other exception to the Fourth Amendment's warrant requirement justified the reentry, we must conclude that all evidence of criminal wrongdoing coming from the reentry had to be suppressed.

We cannot agree with the Superior Court's contrary analysis that Trooper Smolleck's reentry to obtain information to complete his report on the broken window was merely part of "one continuous episode" that was initially justified by the emergency on the roof. *Wilmer*, 296 MDA 2016 at 10. According to the Superior Court, "when police are properly authorized to enter a dwelling under the [emergency aid exception], they are also authorized to return to complete the necessary paperwork required by the emergency situation that allowed them to enter the dwelling in the first place." *Id.* The court reasoned that Trooper Smolleck's reentry was not motivated by any criminal investigatory purpose, but rather was limited to performing "entirely reasonable" police functions. *Id.* In support of these contentions, the Superior Court cited to two cases, *Commonwealth v. Witman*, 750 A.2d 327 (Pa. Super. 2000), and *Michigan v. Tyler*, 436 U.S. 499 (1978). Based on our review, however, these cases do not support any contention that the right of entry under the emergency aid exception may be extended or continued by administrative (non-investigative) considerations.

The Superior Court cited to *Witman* for the proposition that "where police are conducting a valid search pursuant to a defendant's implied consent, the initial investigation in its entirety is permissible and such an investigation may require officials to remain on the scene for an extended period of time repeatedly entering or re-entering the building… ." *Id.* at 10-11. Despite this description of its prior decision, *Witman* dealt primarily with the issue of consent to search a residence. In that case, Witman called 911 seeking the assistance of emergency medical relief for his brother. *Id. at* 330. Upon their arrival, Witman explained that he was upstairs when he heard a struggle, at which time he went downstairs and found his brother (who he would later be convicted of killing) on the kitchen floor. During questioning, he became hysterical and had to be taken to the hospital. *Id. at* 331. Witman's mother arrived around this time and told the police to "do your job and find out who did this." *Id.* at 332. At the hospital, Witman's father also told the police "whatever it takes, do." *Id.* at 333.

Based on these facts, the Superior Court in *Witman* concluded that Witman's call for emergency assistance provided implied consent for the initial entry and a protective sweep of the premises. *Id.* at 337. After Witman had left the scene, the Superior Court found that the statements of the mother and father provided the necessary consent to continue the investigation of the crime scene without interruption to obtain a warrant. *Id.* at 337-39.

The Superior Court also cited to *Michigan v. Tyler*, 436 U.S. 499 (1978), in which the United States Supreme Court held that a fire official may, without a warrant, enter a burning building to fight the fire. The fire creates an exigency that renders a warrantless entry reasonable. *Id.* at 509. Furthermore, because fire officials are charged with not

only extinguishing fires but also determining their origins, fire officials may, without obtaining a warrant, remain on the scene to conduct an administrative search to investigate the cause of the fire. *Id.* at 511. Because the fire was extinguished late at night, fire officials left the scene and reentered the building the next morning to complete their administrative search. *Id.* at 511. The Court held, "Under the circumstances, we find that the morning entries were no more than actual continuation of the first, and the lack of a warrant thus did not invalidate the resulting seizure of evidence." *Id.*

In a case involving similar facts, this Court followed *Tyler* in *Commonwealth v. Smith*, 511 A.2d 796 (Pa. 1986). We summarized the relevant law in this area as follows:

> Firemen have the right to enter a private residence without a warrant without violating the Fourth and Fourteenth Amendments of the United States Constitution, if done so for the purpose of extinguishing a fire. While performing the task, firemen may seize any evidence, which is in plain view, of the cause and origin of the fire. In fighting the fire, fire officials are also immediately charged with determining the cause and origin of the fire. The purposes of the investigation into the cause and origin of the fire may properly include prevention of the rekindling of the fire, and prevention of the destruction of evidence, either accidentally or intentionally. When the search is conducted for one of these purposes, no search warrant is necessary, even if consent has not been granted, but only if the search is a continuation of an initial entry. If the nonconsenting, warrantless entry is begun, but must be terminated due to the condition of the building, then that search may be continued at the first instance reentry is possible. Finally, if it is clearly shown that the search is not for the purpose of determining the cause and origin of the fire, but rather to obtain evidence of criminal activity, then such search must either be with consent or with a valid search warrant.

*Id.* at 801.

As is evident from a review of the cases relied upon by the Superior Court in the case before us, they are readily distinguishable. *Witman* did not involve any application

of the emergency aid exception to the warrant requirement. Moreover, while the police did enter and reenter the home during the course of their investigation, the intermediate appellate court approved the entry and reentry based upon the initial implied consent of Witman and thereafter based upon the express consent of his mother and father. Likewise, while *Tyler* permits the reentry of premises after the emergency has dissipated (i.e., after the fire has been extinguished), it did so based upon a fire official's duty to determine the cause of a fire, and the urgency to do so quickly before the evidence dissipates, concluding that this justifies the lack of any requirement that they stop to obtain a warrant before doing so. *Tyler*, 436 U.S. at 510. Firefighters in such circumstances are not engaged in administrative housekeeping activities, but are instead performing their charged duty of determining the cause and origin of the fire to which they responded.

As such, these cases do not establish any constitutional basis for Trooper Smolleck to reenter the sorority house. We likewise reject the Commonwealth's attempt to justify Trooper Smolleck's reentry by way of analogy to an inventory search of an impounded vehicle. *See* Commonwealth's Brief at 44. Inventory searches, the Commonwealth states, are performed to protect both the property owners from disappearances of personal property in the vehicle while it is impounded and the police from claims of lost or stolen property while the vehicle is in police possession. *Id.* at 45 (citing *Lagenella*, 83 A.3d at 102-03). According to the Commonwealth, *Lagenella* "recognizes the importance of police recordkeeping (a community caretaking action) for potential property claims." *Id.*

We reject any suggestion that the need for accurate police recordkeeping in connection with potential property claims justifies the entry into a private residence.

Warrantless inventory searches are permitted because a private citizen's property is temporarily in the possession of the police, a circumstance that generates legitimate concerns by both parties. No similar concerns arise in the present context, however, as the police did not seize the sorority house. Instead, the Troopers merely temporarily invaded the private dwelling to obviate an emergency situation, and the accuracy of police recordkeeping in this circumstance is of no constitutional moment.

As our above analysis reflects, once the emergency that permitted the Troopers' initial entry ceased, their right of entry in the sorority house under the emergency aid exception also ceased. As a result, their actions from that point forward must be evaluated under traditional Fourth Amendment principles, *Livingstone*, 174 A.3d at 637, and Trooper Smolleck thus could not reenter the sorority house without a warrant or some other basis for claiming an entitlement to a different exception to the warrant requirement.[14] Because no other exception to the warrant requirement applied to permit

---

[14] The learned Dissent contends that our decision fails to follow the teachings of *Livingstone*, as we have not evaluated the police's post-emergency conduct under traditional Fourth Amendment principles. Dissenting Op. at 1-2. According to the Dissent, the police are not required to leave the dwelling after the emergency justifying their entry has abated, so long as the officers do not remain for criminal investigative purposes. *Id.* at 2. Instead, agreeing with the Superior Court, the Dissent posits that the emergency aid exception should be evaluated on a "one continuous episode" approach, with that "episode" defined as including both the initial entry in response to the emergency and thereafter a "continued police presence" for the purpose of "follow up related to the circumstances" of the emergency entry. *Id.* at 2-3.

We disagree that our decision does not faithfully adhere to *Livingstone*'s command to strictly apply Fourth Amendment principles after the emergency ends. In our view, the only constitutionally significant "episode" is the emergency justifying the warrantless entry. As *Mincey* and its progeny make abundantly clear, the "episode" must be "strictly circumscribed" by the emergency that permitted the initial entry. *Mincey*, 437 U.S. at 393; *Neighbors*, 328 P.3d at 1093. When the officers determine that nobody inside is in further need of emergency assistance, the emergency "episode" ends and the police must leave

his reentry, Trooper Smolleck did not observe the glass marijuana bong and pipe in the sorority house from a lawful vantage point, *Commonwealth v. Petroll*, 738 A.2d 993, 999 (Pa. 1999), and accordingly, the plain view exception to the Fourth Amendment did not justify his warrantless seizure of those items. The trial court's denial of Wilmer's suppression motion was therefore error, as was the Superior Court's affirmance of that denial.

For the reasons set forth herein, we reverse the order of the Superior Court, vacate Wilmer's judgment of sentence, and remand to the trial court for further proceedings.

Chief Justice Saylor and Justices Baer, Todd, Dougherty and Wecht join the opinion.

Justice Mundy files a dissenting opinion.

---

forthwith (and may not reenter) unless some other Fourth Amendment principle permits their continued presence.

There is no "gathering information to complete paperwork" exception to the Fourth Amendment's warrant requirement. As such, when the emergency ended in this case, no constitutional basis existed for the police either to remain inside the dwelling or to leave it and then reenter. In this regard, we note parenthetically that Trooper Smolleck's stated reason for reentering the sorority house (to obtain the names of one or more of the residents) could have been resolved in multiple other ways, including a later phone call or any other form of routine communication.