J-A25004-21

2021 PA Super 238

COMMONWEALTH OF PENNSYLVANIA  :  IN THE SUPERIOR COURT OF
                                        :  PENNSYLVANIA
                                        :
            v.                              :
                                        :
                                        :
BRITTAN L. DAVENPORT            :
                                        :
           Appellant               :   No. 161 WDA 2021

Appeal from the Judgment of Sentence Entered January 8, 2021,
in the Court of Common Pleas of Allegheny County,
Criminal Division at No(s):  CP-02-CR-0002543-2020.

BEFORE:   KUNSELMAN, J., KING, J., and COLINS, J.[*]

OPINION BY KUNSELMAN, J.:               **FILED: DECEMBER 8, 2021**

Brittan L. Davenport appeals from the judgment of sentence imposed

following his conviction for persons not to possess a firearm.[1]  We affirm.

The trial court summarized the relevant factual history as follows:

> Officer Ilija Tubin of the McKeesport Police Department
> testified that on January 12, 2020, he responded to a report of a
> male overdose in the area of 2422 Bangkok Street.  Office Tubin
> testified that he arrived at the scene and spoke with [Davenport's]
> mother, Kayla Linnon, who had contacted the police regarding her
> son.  Officer Tubin testified that Linnon said her son had smoke[d]
> K2 marijuana, and that she had found him unconscious on the
> back porch.  [K2 is a synthetic cannabinoid known to cause heart
> attacks and strokes.]  The officer observed [Davenport], face
> down on the back porch, breathing but not responding to anyone.
> Medics attended to [Davenport] and he began to regain
> consciousness.  As [Davenport] started to get up, Officer Tubin
> observed a heavy bulge in the front pocket of [Davenport's]
> hooded sweatshirt.  The officer testified that he knew immediately

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] **See** 18 Pa.C.S.A. § 6105(a)(1).

it was a firearm. Officer Tubin alerted Lieutenant Alper that [Davenport] had a firearm, at which point Lieutenant Alper did a pat-down for safety and recovered the firearm. [Davenport's] father observed the retrieval of the firearm and stated, "[t]hat's a violation."

Trial Court Opinion, 4/21/21, at 3 (citations to the record omitted).

Davenport was arrested and charged with, *inter alia*, possession of a firearm prohibited. Prior to trial, Davenport filed a motion to suppress the gun found on his person. On September 8, 2020, the trial court entered an order denying Davenport's motion to suppress. On January 8, 2021, the matter proceeded to a non-jury trial at the conclusion of which the trial court found Davenport guilty of persons not to possess a firearm. The trial court immediately sentenced Davenport to six to twelve years in prison. Davenport did not file a post-sentence motion; however, he did file a timely notice of appeal. Both Davenport and the trial court complied with Pa.R.A.P. 1925.

Davenport raises the following issue for our review:

Did the trial court err by failing to grant suppression in this case because the officers did not have reasonable suspicion that criminal activity was afoot? More specifically, once the officers completed the wellness check and Mr. Davenport's medical emergency ended, did officers have the authority to seize [Davenport] without an additional exigency or was suppression of the evidence warranted?

Davenport's Brief at 6.

Our review of an order denying a motion to suppress is limited:

We may consider only the Commonwealth's evidence and so much of the evidence for the defense as remains uncontradicted when read in the context of the [suppression] record as a whole. Where the [suppression] record supports the factual findings of

> the trial court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error.

*Commonwealth v. Russo*, 934 A.2d 1199, 1203 (Pa. 2007) (citations omitted). As an appellate court, we are not bound by the suppression court's conclusions of law; rather, when reviewing questions of law, our standard of review is *de novo* and our scope of review is plenary. *Id*.

Under the Fourth Amendment, "searches and seizures without a warrant are presumptively unreasonable," subject only to specifically established exceptions. *See Katz v. United States*, 389 U.S. 347, 357 (1967). Certain of these exceptions arise in the context of law enforcement and are related to the detection, investigation and prevention of criminal activity, such as the exigent circumstances exception, the "plain view" exception, searches incident to arrest, consent searches, automobile searches, and the imminent criminal activity exception. *See Commonwealth v. Wilmer*, 194 A.3d 564, 568 (Pa. 2018).

In addition to these crime-related exceptions, courts have recognized that law enforcement officers legitimately perform community caretaking activities that also necessitate exceptions to the warrant requirement. *Id*. The community caretaking doctrine has been characterized as encompassing three specific exceptions to the warrant requirement: the emergency aid exception, the public servant exception, and the automobile impoundment/inventory exception. *See id*. at 585. Each of the exceptions contemplates that police officers engage in a wide variety of activities relating

to the health and safety of citizens unrelated to the detection, investigation and prevention of criminal activity. *Id*. Nevertheless, community caretaking activities must be performed in strict accordance with the Fourth Amendment. *Id*. at 586.

At issue in this case is the emergency aid exception which permits police officers to make warrantless entries and searches when they reasonably believe that a person is in need of immediate aid. *Id*. at 570-71. As with all of the community caretaking exceptions, actions by police pursuant to the emergency aid exception must be independent from the detection, investigation, and acquisition of criminal evidence. *Commonwealth v. Livingstone*, 174 A.3d 609, 635 (Pa. 2017). Additionally, a warrantless intrusion pursuant to the emergency aid exception must be commensurate with, and limited to, the perceived need to provide immediate assistance. *Wilmer*, 194 A.3d at 571. In other words, once the emergency that permitted the police officers to act without a warrant has ceased, their right to enter and search under the emergency aid exception has also ceased. *Id*. at 592 (explaining that once the emergency had ended and the troopers left the premises, their subsequent re-entry of the residence to conduct a search required a warrant).

Here, Davenport concedes that the police were lawfully at his residence pursuant to the emergency aid exception. However, Davenport maintains that when he regained consciousness and began to get up from the porch floor to

- 4 -

go to the hospital with medical personnel, the reason for the officers' presence in the home ended and the officers were required to leave. According to Davenport, once medical assistance had been administered, the officers had no authority to conduct a pat-down without an additional finding of either probable cause or a reasonable suspicion that criminal activity was afoot. Davenport claims that the search was premised solely upon the officers viewing the outline of a gun in his sweatshirt front pocket. Davenport insists that the mere possession of a gun, particularly in one's own home, does not create reasonable suspicion that criminal activity is afoot. Davenport contends that, because the seizure was not supported by either reasonable suspicion or probable cause, all evidence flowing from that seizure should have been suppressed.[2]

Even if we were to accept Davenport's argument that the emergency, which permitted the officers to lawfully enter the home to render aid to him, ceased when he began to regain consciousness, we cannot accept Davenport's

---

[2] Davenport also argues that "an unconstitutional seizure occurred when his freedom of movement was restricted by the officers who prevented him from going to the hospital for treatment." Davenport's Brief at 24. However, Davenport did not raise this issue before the suppression court. In his motion to suppress, Davenport challenged only the search of his person and argued that "[a]t the time of the search, the [o]fficers lacked probable cause to believe that [Davenport] was in possession of illegal items or engaged in criminal activity." Omnibus Pretrial Motion, 8/14/20, at unnumbered 2, ¶ 3. Nor did Davenport claim that he was unlawfully detained at the suppression hearing. *See* N.T., 9/8/20. 1-31. Thus, he failed to preserve this issue for our review. *See* Pa.R.A.P. 302(a) (providing that issues not raised in the lower court are waived and cannot be raised for the first time on appeal).

implied argument that the officers were, at that same moment, dispossessed of any right to consider their own safety without formulating probable cause or a reasonable suspicion that criminal activity was afoot.

As the United States Supreme Court has explained:

> We are now concerned with more than the governmental interest in investigating crime; in addition, there is the more immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him. Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties. American criminals have a long tradition of armed violence, and every year in this country many law enforcement officers are killed in the line of duty, and thousands more are wounded. Virtually all of these deaths and a substantial portion of the injuries are inflicted with guns and knives.
>
> In view of these facts, we cannot blind ourselves to the need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest. When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm.

*Terry v. Ohio*, 392 U.S. 1, 23-24 (1968).

In the cases that have followed *Terry* over the last fifty years, the High Court has emphasized that considerations of officer safety must be preceded by a finding that the individual was lawfully subjected to an investigative detention, *i.e.*, that the officer had reasonable suspicion that criminal activity was afoot. However, these cases have generally dealt with officer safety

- 6 -

concerns in the context of investigating and preventing criminal activity rather than performing community caretaking functions, such as rendering emergency aid. And while the High Court has addressed the emergency aid exception, it has, to date, provided little guidance regarding officer safety considerations when performing emergency aid activities. *See Mincey v. Arizona*, 437 U.S. 385 (1978) (holding that when police enter the scene of a homicide they may make a prompt warrantless search of the area to see if there are other victims or if a killer is still on the premises).

Nevertheless, this Court has considered officer safety in the context of rendering emergency help and assistance and has determined the circumstances under which police may perform a protective pat-down for weapons:

> In today's complex society, police are "charged with the protection of constitutional rights, the maintenance of order, the control of pedestrian and vehicular traffic, the mediation of domestic and other non-criminal conflicts, and supplying emergency help and assistance." *La Fave, Street Encounters and the Constitution*; Terry, Sibron, Peters and Beyond, 67 Michigan L. Rev. 40, 61-62 (1968). ***Accord Cady v. Dombrowski***, 413 U.S. 433, 93 S. Ct. 2523, 37 L.Ed.2d 706 (1973) (police engage in community caretaking functions). ***If during the execution of these tasks an officer determines that*** "***[a] reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger***," ***the officer may conduct a protective pat-down search***. ***Terry***, 392 U.S. at 27, 88 S. Ct. at 1883. The officer is empowered to neutralize the danger posed by the party with whom he is dealing. The search must be limited to the accomplishment of the goal which justified its commencement, namely, protection of the officer. The officer's action must be confined to a pat-down search for the discovery of weapons.

> *Sibron v. New York*, 392 U.S. 40, 88 S. Ct. 1889, 20 L. Ed.2d 917 (1968).

*Commonwealth v. Rehmeyer*, 502 A.2d 1332, 1336 (Pa. Super. 1985), *appeal denied*, 531 A.2d 780 (Pa. 1987) (emphasis added).

In *Rehmeyer*, a police officer lawfully conducted a traffic stop and, upon investigation, determined that there was probable cause to believe that appellee was driving under the influence of alcohol. However, as the officer felt that the case was borderline, he decided not to arrest appellee and instead offered appellee the option to either get a ride home from a family member or accept a ride home from the officer in his patrol car. The appellee accepted the latter option. The officer then executed a limited pat-down search of appellee for the purpose of discovering any concealed weapons to ensure that appellee would pose no danger to the officer during the trip to appellee's home. During the search, the officer discovered a .22 caliber pistol. The appellee was subsequently charged with a firearm offense. However, the suppression court granted appellee's motion to suppress the gun, reasoning that, because appellee was not placed under arrest, the officer was required to form a reasonable belief that appellee was armed and dangerous before conducting the pat-down search.

On appeal, this Court reversed the suppression court's ruling. In so doing, it initially held that where probable cause to arrest exists but the officer does not effectuate the arrest, the officer may nevertheless conduct a protective pat-down search when he decides to transport the individual in the

patrol car. *Id*. at 1335 (holding "that if probable cause to arrest exits, but the officer does not effectuate an arrest, the officer may nevertheless conduct a protective pat-down search when he decides to transport the individual in the patrol car"). The Court additionally held that the officer's pat-down of appellee was independently justified under the circumstances. As noted above, in **Rehmeyer**, we ruled that "[i]f during the execution of [community caretaking function] an officer determines that '[a] reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger,' the officer may conduct a protective pat-down search." *Id*. at 1336.

In this Court's view, the officer's offer to give appellee a courtesy ride home and the officer's decision to conduct a limited pat-down of appellee prior to permitting him in his patrol car "fell squarely" within these requirements. *Id*. We explained:

> Though [appellee] had not shown any signs of violence, [the officer] acted reasonably in assuming that appellee could possibly enter the patrol car with a deadly weapon. Once behind the wheel of the patrol car, [the officer] would be an easy mark. A reasonably prudent man in the same situation would believe that his safety was in jeopardy. "It [is] unreasonable to require the police officers to take unnecessary risks in the performance of their duties." [**Terry**, 392 U.S. at 23].

*Id*.

In the instant matter, it is undisputed that the officers were supplying emergency help and assistance to Davenport pursuant to the emergency aid

exception. Thus, as in *Rehmeyer*, we employ a "reasonably prudent man" analysis to Lieutenant Alper's decision to pat-down Davenport for weapons.[3]

According to the suppression record, when Officer Tubin responded to the emergency call from Davenport's mother, who reported that she had found Davenport unconscious on her back porch after he had smoked K2 marijuana, Officer Tubin observed that Davenport was breathing but unresponsive. N.T., 9/8/20, at 13-14. Officer Tubin indicated that "[o]nce [Davenport] began kind of coming to a little bit, we had medics there to assist." *Id*. However, when Davenport began to get up, Officer Tubin observed a heavy bulge in the front pocket of Davenport's hooded sweatshirt. *Id*. at 15. According to Officer Tubin, he "immediately knew it was a firearm." *Id*. Officer Tubin alerted Lieutenant Alper that Davenport had a firearm on him, at which point the lieutenant conducted a pat-down for officer safety and located the firearm inside Davenport's pocket. *Id*.

Although the officers were present at Davenport's home to render emergency assistance, this did not preclude the possibility that they might encounter an armed and dangerous individual. Under the circumstances, it was not unreasonable for them to be concerned about their safety when

---

[3] Davenport does not acknowledge or discuss this Court's decision in *Rehmeyer*. Instead, he relies on numerous cases which are both legally and factually distinguishable from the case *sub judice*. *See* Davenport's Brief at 15-29.

rendering assistance to Davenport. Given that the responding officers were informed that Davenport had overdosed on illegal drugs, they could reasonably have concluded that he might pose a further threat of harm to himself and others, including the officers, Davenport's parents, and the medics who were attending to Davenport and preparing to transport him to the hospital. This inference, combined with the officers' observation of the bulge in Davenport's pocket which Officer Tubin immediately recognized was a gun, amply supported a finding that "a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Rehmeyer*, 502 A.2d at 1336.

In suspecting that Davenport may have a concealed weapon, the officers were not acting on an "inchoate [or] unarticularized suspicion or hunch" but rather on "the specific reasonable inferences which [they were] entitled to draw from the facts in light of [their] experience." *Id*. (citing *Terry*, 392 U.S. at 27). Moreover, the officers' objective was not the prosecution of a crime but to ensure safety. *Id*. at 1338. Thus, the officers were authorized to conduct a protective pat-down search of Davenport in order to protect their safety as well as the safety of the other individuals who were present.

Based on our review of the suppression record, because the officers conducted a lawful pat-down of Davenport, we affirm the court's order denying suppression of his gun.

Judgment of sentence affirmed.

- 11 -

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date:  12/8/2021