J-E02004-18

2018 PA Super 304

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
Appellant :
:
:
:
v. :
:
:
:
PADRAIC COUGHLIN : No. 3492 EDA 2016

Appeal from the Order October 11, 2016
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0011139-2015

BEFORE: GANTMAN, P.J., BENDER, P.J.E., PANELLA, J., SHOGAN, J.,
LAZARUS, J., STABILE, J., DUBOW, J., NICHOLS, J., and
McLAUGHLIN, J.

OPINION BY McLAUGHLIN, J.: **FILED NOVEMBER 14, 2018**

The Commonwealth appeals from the order entered October 11, 2016, granting Padraic Coughlin's motion to suppress physical evidence seized by police and statements made following his arrest. As police had a reasonable basis to conduct a protective sweep of Coughlin's home to confirm that no injuries had occurred following corroborated reports that he had fired an assault rifle multiple times, we conclude that police properly invoked the emergency aid exception to the Fourth Amendment protection against warrantless entry of a home. Accordingly, we reverse in part and remand for further proceedings.

In August 2015, Philadelphia police responded to a radio call reporting that multiple shots had been fired in the back yard of a residence located in a high-crime neighborhood. Peering into the back yard while perched upon a

wall, police observed a white male, later identified as Coughlin, as well as numerous shell casings on the ground. Seeing no firearm—in the back yard or on his person—police secured Coughlin and asked him if anyone else was in the residence. Upon receiving inconsistent answers from Coughlin, police performed what they later described at the suppression hearing as a "protective sweep" of the home to insure that no one had been injured. On the second floor, police found and seized an assault rifle. **See generally** Notes of Testimony (N.T. Suppression), 10/11/2016.

Police charged Coughlin with a violation of the Uniform Firearms Act (VUFA), 18 Pa.C.S.A. § 6106; possessing instruments of crime (PIC), 18 Pa.C.S.A. § 907; and recklessly endangering another person (REAP), 18 Pa.C.S.A. § 2705. In February 2016, the VUFA charge was quashed.

Thereafter, Coughlin filed an omnibus pretrial motion, seeking suppression of the assault rifle and statements made to police following his arrest. **See** Omnibus Motion, 02/03/2016; N.T. Suppression at 6. Following a hearing, the suppression court granted Coughlin's motion.[1]

---

[1] In Coughlin's written motion, he did not seek suppression of any statements made to police. **See** Omnibus Motion. However, Coughlin expanded the scope of his motion orally at the start of the suppression hearing. **See** N.T. Suppression at 6. At the end of the hearing, the court granted Coughlin's motion. **Id.** at 50. Though no written order appears in the certified record, the court docket includes an entry that the court granted Coughlin's motion to suppress "physical evidence and statement." Dkt. No. CP-51-CR-0011139-2015, at 7 (capitalization removed).

The Commonwealth timely appealed.[2] In its Pa.R.A.P. 1925(b) statement, the Commonwealth challenged the suppression of the firearm but declined to preserve any claim regarding the suppression of Coughlin's statements. Commonwealth's Pa.R.A.P. 1925(b) Statement, 11/08/2016. The court filed a responsive opinion, in which it detailed its findings:

According to the testimony of Commonwealth witness Police Officer Paul Sulock, on August 30, 2015 at approximately 9:20 p.m., Officer Sulock together with his partner [] responded to a radio call for a possible shooting at 1826 East Madison Street in the City and County of Philadelphia. As Officer Sulock pulled up to [] East Madison Street, two white females and a younger white male flagged them down. One of the white females, Jessica Cupps, told Officer Sulock that there was a white male, dressed in all black, by the name of Pat, appearing "crazy," and shooting an assault rifle in the back of the property.

Officer Sulock and Officer Rebstock[] went to the back of Ms. Cupps' property at 1828 East Madison Street to obtain access to 1826 East Madison Street where the alleged shooting was reported to have occurred. When Officer Sulock got to the back of Ms. Cupps' property, he observed a seven (7) foot high cement wall separating the back yard[s of the adjoining East Madison Street properties.] While Officer Rebstock gave Officer Sulock protective cover, Officer Sulock straddled the wall, shone a flashlight into the back yard of 1826 East Madison Street, noticed bullet casings, and [Coughlin] came out of the door at a fast pace. Officer Sulock drew his weapon, ordered [Coughlin] to the ground, [Coughlin] immediately complied, and Officer Sulock promptly placed [Coughlin] in handcuffs. Officer Sulock noted that [Coughlin] was "very compliant" with all of his commands. Once [Coughlin] was on the ground in handcuffs, Officer Sulock[] began to question [him]. Specifically, Officer Sulock asked [whether Coughlin] had a gun on his person and whether anyone else was inside the property. [Coughlin] responded that he did not have a

_____

[2] The Commonwealth has certified that the suppression court's order will terminate or substantially handicap the prosecution. **See** Commonwealth's Notice of Appeal, 11/08/2016; Pa.R.A.P. 311(d).

weapon but was inconsistent as to whether others were inside [his residence]. At this point, there were approximately four (4) to five (5) officers on the scene while Officer Sulock stood in the back yard. At no point did Officer Sulock hear or see evidence that anyone else was in [Coughlin's] home.

Suppression Court Opinion, filed January 6, 2017, at 1-2 (some formatting modified; internal citations and footnotes omitted).

Based on these facts, the court rejected the Commonwealth's assertion that Coughlin's inconsistent statements aroused a valid concern that other persons—possibly injured—were in Coughlin's residence. *Id.* at 7. Rather, according to the court, "Officer's Sulock's desire to locate the gun … is what motivated this warrantless search." *Id.* Finding no other exigencies to justify the warrantless entry, the court concluded that police had violated Coughlin's constitutional rights and that suppression of the gun was appropriate. *Id.* at 8-9.

Before this Court, the Commonwealth renews its argument that the suppression court erred in suppressing the firearm seized during a protective sweep of Coughlin's residence. Commonwealth's Br. at 3. According to the Commonwealth, the relevant inquiry is whether the police had an objectively reasonable basis for their sweep. *Id.* at 9 (citing in support *Michigan v. Fisher*, 558 U.S. 45 (2009)). Based upon the statements from Ms. Cupps, as corroborated by police, the Commonwealth asserts there was probable cause to believe that Coughlin had fired a weapon multiple times. Moreover, his inconsistent statements regarding other persons in the residence made it not only objectively reasonable, but also "imperative to check if he had hurt

anyone on the premises." *Id.* at 10. The Commonwealth cautions against a "hindsight evaluation" of whether an emergency actually existed, suggesting rather that conscientious police officers should err on the side of caution. *Id.* at 9.

In response, Coughlin asserts there was no evidence to support a reasonable belief that anyone was injured or inside his home. Coughlin's Br. at 5. For example, according to Coughlin, police "did not see blood, hear cries for help, [or] receive reports of an assault." *Id.* Moreover, according to Coughlin, the suppression court specifically rejected Officer Sulock's testimony that he entered the house to ensure no one was injured, thus eliminating the sole exigency offered by the Commonwealth. *Id.* at 6-7.

Our standard and scope of review are well settled.

> When the Commonwealth appeals from a suppression order, this Court follows a clearly defined scope and standard of review. We consider only the evidence from the defendant's witnesses together with the evidence of the prosecution that, when read in the context of the entire record, remains uncontradicted. This Court must first determine whether the record supports the factual findings of the suppression court and then determine the reasonableness of the inferences and legal conclusions drawn from those findings.

*Commonwealth v. Champney*, 161 A.3d 265, 271 (Pa. Super. 2017) (citation omitted). To be clear, a suppression court's findings of fact are binding on this Court where supported by the record. *Commonwealth v. Ford*, 175 A.3d 985, 989 (Pa.Super. 2017) (citation omitted); *see also Commonwealth v. Bomar*, 826 A.2d 831, 843 (Pa. 2003) (affording

deference to credibility determinations of fact-finder). However, its conclusions of law are not binding on this Court, "whose duty it is to determine if the suppression court properly applied the law to the facts." **Ford**, 175 A.3d at 989.

Initially, we reject one finding integral to the suppression court's analysis. The suppression court found no evidence that "anyone else was in [Coughlin's] home." Suppression Ct. Op. at 2. The record does not support this finding. Officer Sulock testified consistently that Coughlin presented conflicting accounts of whether other people were inside the residence. **See** N.T. Suppression at 13, 18, 28, 32, 37. Thus, Coughlin's own statements to police provided evidence, albeit inconclusive, that others were inside his home. **See, e.g.**, N.T. Suppression at 13 ("I asked this male if there was anybody else in the property. At first he stated yes[.]"). Importantly, the court did not reject the credibility of this testimony. Quite the contrary, the suppression court accepted this testimony explicitly when it acknowledged that "[Coughlin] … was inconsistent as to whether others were inside." Suppression Ct. Op. at 2 n.2; **see also** N.T. Suppression at 43 (explicitly finding Officer Sulock credible apart from his asserted reason for entering home).

This finding is further undermined by the suppression court's erroneous suggestion that "Officer Sulock clearly testified that he observed no indication (seeing blood, hearing cries, or otherwise) of another person." Suppression Ct. Op. at 7 n.3. We have reviewed Officer Sulock's testimony and conclude

that the suppression court's suggestion is misleading. At no time was Officer Sulock asked whether he saw blood or heard cries from another person. Rather, the court itself opined, during argument following testimony, that the absence of such testimony was concerning. N.T. Suppression at 43. As this finding is not supported by the record, we are not bound by it. **Champney**, 161 A.3d at 271; **Ford**, 175 A3d at 989.

With this correction to the record, we turn to the law governing search and seizure. The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or Affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

The touchstone of the Fourth Amendment is reasonableness. **Fisher**, 558 U.S. at 47; **see also Commonwealth v. Johnson**, 68 A.3d 930, 935 (Pa.Super. 2013) (recognizing "delicate balance" of protecting citizens' rights as well as safety of citizens and police). While the warrantless entry and search of a home is presumptively unreasonable, exigent circumstances may overcome this presumption. **Fisher**, 558 U.S. at 47; **Commonwealth v. Wilmer**, ___ A.3d ___, 2018 WL 4537275, at *3-4 (Pa. filed Sept. 21, 2018); **Ford**, 175 A.3d at 991.

It is well settled that "[e]xigent circumstances exist where the police reasonably believe that someone within a residence is in need of immediate aid." **Ford**, 175 A.3d at 990 (citing **Commonwealth v. Galvin**, 985 A.2d 783, 795 (Pa. 2009)); **see also Fisher**, 558 U.S. at 47-50 (applying the "emergency aid" exception to Fourth Amendment); **Brigham City v. Stuart**, 547 U.S. 398, 403 (2006) ("One exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury"); **Mincey v. Arizona**, 437 U.S. 385, 392 (1978) ("[T]he Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid"); **Wilmer**, 2018 WL 4537275, at *4 (recognizing the emergency aid exception as one of three "community caretaking" exceptions);[3] **Commonwealth v. Miller**, 724 A.2d 895, 900 (Pa. 1999) (excusing police from warrant requirement upon reasonable belief someone within residence in need of immediate aid); **Commonwealth v. Norris**, 446 A.2d 246, 248 (Pa. 1982) (recognizing exception to Fourth Amendment

---

[3] "[T]he community caretaking doctrine encompasses three specific exceptions to the Fourth Amendment's warrant requirement: the public servant exception, the automotive impoundment/inventory exception, and the emergency aid exception." **Wilmer**, ___ A.3d ___ at *4 (internal footnotes omitted; citation omitted); **see also Commonwealth v. Livingstone**, 174 A.3d 609, 634-37 (Pa. 2017) (defining requirements of public servant exception).

protection when officers "in good faith believe that they or someone within are in peril of bodily harm").[4]

Recently, our Supreme Court clarified that the scope of the emergency aid exception must be "strictly circumscribed by the exigencies which justify its initiation." ***Wilmer***, 2018 WL 4537275, at *6 (quoting ***Terry v. Ohio***, 392 U.S. 1, 26 (1968)). In ***Wilmer***, for example, police observed an intoxicated person stumbling on the roof of a sorority house. ***Id.*** at *1. Fearing the person would be injured, police officers forcibly entered the home, damaging property in the process. ***Id.*** Unfortunately, the officers' fears were realized: the person

_____

[4] In ***Commonwealth v. Roland***, 637 A.2d 269 (Pa. 1994), the Pennsylvania Supreme Court identified a number of factors useful to determining whether exigent circumstances exist:

> Among the factors to be considered are: (1) the gravity of the offense, (2) whether the suspect is reasonably believed to be armed, (3) whether there is above and beyond a clear showing of probable cause, (4) whether there is strong reason to believe that the suspect is within the premises being entered, (5) whether there is a likelihood that the suspect will escape if not swiftly apprehended, (6) whether the entry was peaceable, and (7) the time of the entry, *i.e.*, whether it was made at night. These factors are to be balanced against one another in determining whether the warrantless intrusion was justified.

***Id.*** at 270-71. While this multi-factor analysis enables a determination of exigent circumstances where the relevant inquiry is whether police action to preserve evidence of a crime or apprehend a defendant conformed to the protections of the Fourth Amendment, it is of limited utility in a case such as this, where the appropriate inquiry is whether police reasonably believed that someone inside a residence was in need of immediate assistance. ***See Brigham City***, 547 U.S. at 403, 405 (describing certain ***Roland*** factors, including "imminent destruction of evidence," "hot pursuit of a fleeing suspect," and "gravity of the underlying offense" as distinct exceptions to warrant requirement).

fell from the roof and required treatment from emergency personnel on the ground outside. *Id.* The police left the sorority house but then *reentered without permission* to complete a property damage report. *Id.* Upon reentry, police observed and seized contraband from a resident. *Id.* Our Supreme Court rejected an argument from the Commonwealth that the multiple entries constituted "one continuous episode." *Id.* at 8. According to the Court, "once the emergency that permit[s] [warrantless] entry [has] ceased, [the] right of entry … under the emergency aid exception [has] also ceased." *Id.* at 9. Thus, the police had exceeded the narrowly circumscribed scope of the emergency aid exception. Finding no other relevant exception, the court deemed the reentry by police unlawful. *Id.*

Nevertheless, "[o]fficers do not need ironclad proof of a 'likely serious, life-threatening' injury to invoke the emergency aid exception." *Fisher*, 558 U.S. at 49.

> The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving. Additionally, it is a matter of common sense that a combination of events each of which is mundane when viewed in isolation may paint an alarming picture.

*Ford*, 175 A.3d at 990 (quoting *Ryburn v. Huff*, 565 U.S. 469, 476-77 (2012)); *see also Commonwealth v. Davido*, 106 A.3d 611, 624 (Pa. 2014) ("[E]rring on the side of caution is exactly what we expect of conscientious police officers").

In ***Brigham City***, for example, police responded to a noise complaint. ***Brigham City***, 547 U.S. at 400-01. Upon arrival, they observed juveniles drinking beer in the back yard of a residence and an altercation taking place inside the home, where several adults were attempting to restrain another juvenile. ***Id.*** at 401. Breaking free, the juvenile struck an adult with a closed fist, drawing blood. ***Id.*** The police then entered the home and ended the altercation before anyone suffered a serious injury. ***Id.***

Charges were filed, but the lower court granted a motion to suppress based on the warrantless entry of the home. ***Id.*** Upon review, the United States Supreme Court found the entry reasonable under the circumstances, attaching little significance to the level of violence observed. ***Id.*** at 404-06.

> In these circumstances, the officers had an objectively reasonable basis for believing both that the injured adult might need help and that the violence in the kitchen was just beginning. Nothing in the Fourth Amendment required them to wait until another blow rendered someone "unconscious" or "semi-conscious" or worse before entering. The role of a peace officer includes preventing violence and restoring order, not simply rendering first aid to casualties; an officer is not like a boxing (or hockey) referee, poised to stop a bout only if it becomes too one-sided.

***Id.*** at 406.

The Supreme Court's decision in ***Fisher*** is also instructive. In that case, police officers responded to a complaint of a "disturbance." ***Fisher***, 558 U.S. at 45. Upon arrival, two persons directed the officers to a residence where a man was "going crazy." ***Id.*** The officers observed a chaotic scene, with damage to the home and to a pickup truck parked in the driveway. ***Id.*** at 45-

46. Through windows of the home, the officers observed Fisher screaming and throwing things. *Id.* at 46. The officers also noticed blood outside the home and that Fisher had a cut on his hand. *Id.* The officers knocked, but Fisher refused to answer the door. *Id.* In response to questions whether he needed medical attention, Fisher demanded that officers obtain a search warrant. *Id.* At this point, one of the officers entered the home. *Id.* However, Fisher pointed a long gun at him, and the officer withdrew. *Id.*

Fisher was charged with assault, but the trial court granted his motion to suppress evidence obtained following the warrantless entry of his home, *i.e.*, the officer's statement that Fisher had pointed a gun at him. *Id.* Upon review, the appellate court affirmed the trial court, concluding that the situation did not rise to the level of an emergency and finding it significant that "the mere drops of blood did not signal a likely serious, life-threatening injury." *Id.* at 48.

On these facts, the United States Supreme Court reversed the decision to suppress, concluding that the officer's entry was objectively reasonable. The Court reasoned that the observed, violent behavior "*might* have a human target (perhaps a spouse or a child) and, thus, the officers "need[ed] to ensure that Fisher was not endangering someone else in the house." *Id.* at 49 (emphasis added). The Court specifically rejected the appellate court's "hindsight determination that there was in fact no emergency." *Id.*

> It does not meet the needs of law enforcement or the demands of public safety to require officers to walk away from a situation like the one they encountered here. Only when an apparent threat has

become an actual harm can officers rule out innocuous explanations for ominous circumstances. But the role of a peace officer includes preventing violence and restoring order, not simply rendering first aid to casualties. It sufficed to invoke the emergency aid exception that it was reasonable to believe that Fisher had hurt himself (albeit nonfatally) and needed treatment that in his rage he was unable to provide, or that Fisher was about to hurt, or had already hurt, someone else.

*Id.* (internal quotation marks and citation omitted).

Most recently, in *Ford*, police responded to reports of someone bleeding and someone with a gun. *Ford*, 175 A.3d at 988. Upon arriving at the scene, a "distraught" neighbor indicated to police that no shots had been fired. *Id.* at 991. No evidence ever corroborated the initial report that someone was bleeding. Nevertheless, police heard multiple voices screaming inside the home. *Id.* at 988. When no one answered the front door, police entered the home, whereupon they arrested an occupant for possession of a firearm. *Id.* at 989. The trial court denied a motion to suppress, and this Court affirmed. Based on the facts presented, and noting the incident occurred in a high-crime area, we concluded that "the officers reasonably believed that there was an immediate threat of violence." *Id.* at 991.

Here, the undisputed evidence at the suppression hearing was that Coughlin had fired an assault rifle numerous times in a neighborhood known for gun violence. While the initial report suggested that he was shooting the firearm in his back yard, the report did not foreclose a reasonable possibility that one or more of the shots was fired inside the residence. When Ms. Cupps

flagged down the police, she warned Officer Sulock to be careful and described Coughlin as acting "crazy," not unlike the defendant in *Fisher*.

While police officers are accustomed to investigating such reports, there can be no doubt that Coughlin's actions had created a particularly dangerous situation, the full extent of which could not be known to Officer Sulock and the other officers when they approached Coughlin's residence. Of course, the gravity of the situation increased further when Officer Sulock observed spent shells in Coughlin's back yard, thus corroborating the initial report. It can hardly be overstated that a credible report of multiple shots fired from an assault rifle in a residential neighborhood presents danger far greater than the brief altercation observed in *Brigham City* or the initial observations by police in *Fisher*, where the defendant was merely throwing things around his home.

We must also consider the interaction between Officer Sulock and Coughlin. Upon securing Coughlin and failing to observe the reported firearm, Officer Sulock inquired whether anyone else was in the home. Clearly, this was a reasonable inquiry. A second person potentially involved in the reported shooting could pose a risk to others if this person was in possession of the firearm. But Coughlin's inconsistent answers raised another reasonable concern—that another person in the house could be a victim, not an accomplice.

The suppression court discounted the significance of Coughlin's inconsistent statements. In its view, Coughlin's inconsistency "was better explained by the possible mental health issue described by eyewitnesses."

Suppression Ct. Op. at 8. In support of this inference, the court continued, "It must be specifically noted that the eyewitness in this case was also [Coughlin's] neighbor who clearly was in a greater position of knowledge concerning [Coughlin's] mental health and residential occupancy than the police officers involved." *Id.* at 8 n.4.

We reject, on this record, the court's inference that Coughlin suffered from mental illness. *See Champney*, 161 A.3d at 271. The single, evidentiary source for this finding occurred during Officer Sulock's direct testimony. In describing how he gained access to the back yard of Coughlin's property, Officer Sulock testified as follows:

> [Ms. Cupps] stated that there was a male in the rear shooting an assault rifle off the back of that property. . . . I asked her for a description of the male, and she said it was a white male wearing all black that goes by the name of Pat. I asked [Ms. Cupps] if I could enter her property to get to the rear and she let me through and stated to me be careful, *he is crazy shooting a gun*. I asked her if he was still out there and she stated she believed so.

N.T. Suppression at 11-12 (emphasis added). In our view, the statement, "he is crazy shooting a gun," is merely colloquial. But whether Ms. Cupps' intention was colloquial or clinical, this passing reference to Coughlin's behavior is inadequate to support the court's analysis. Furthermore, even assuming Coughlin's alleged mental illness were an established fact, it would not, on this record, dispel the officer's reasonable concern that an accomplice or a victim might be in the residence.

The suppression court also stressed that there was no blood found, no cries for help, or other readily apparent evidence that someone had been injured. Suppression Ct. Op. at 8. However, the Supreme Court has rejected analyses that quantify blood evidence found at the scene. *See Fisher*, 558 U.S. at 48-49 (concluding that "mere drops of blood" sufficient to invoke emergency aid exception); *Brigham City*, 547 U.S. at 406 (similarly concluding bloody lip sufficient). Moreover, the Court in *Fisher* voiced concern for *potential* human targets, neither seen nor heard. *Fisher*, 558 U.S. at 48. Practically speaking, here, any injuries caused by Coughlin inside the residence would not produce blood in the back yard. Thus, the absence of such evidence is of little consequence. In this regard, the facts are more compelling than those in *Ford*, where no shots were fired and where there was no evidence of injury. *Ford*, 175 A.3d at 990-91.

In our view, Coughlin's interaction with police is reminiscent of the "ominous circumstances" recognized by the Supreme Court in *Fisher*. Here, too, police confronted a dangerous situation. Coughlin's inconsistent statements exacerbated it. While there was no proof that Coughlin had injured someone, under these circumstances it was reasonable for police to *confirm* that he had not. As the Supreme Court has instructed, "[i]t does not met the needs of law enforcement or the demands of public safety to require officers to walk away" from a potentially life-threatening situation. *Fisher*, 558 U.S. at 49. Thus, we reject a hindsight determination that there was no emergency.

Regarding the scope of the police intrusion into Coughlin's residence, we discern no overly broad conduct by the police. Here, unlike in **Wilmer**, no facts established that police entered the home on multiple occasions or that they discovered the firearm upon reentry, after they had confirmed no injured persons were present. Nevertheless, it is worth noting that the suppression court voiced concern that police searched both the first and second floor of the home. **See** N.T. Suppression at 49 (rejecting search of second floor but suggesting cursory sweep of first floor permissible). This concern is without merit. Coughlin could have injured someone on either floor of his home, and it would defy reason for police to limit their emergency aid to victims located on the first floor alone. Thus, under these circumstances, we conclude that the search by police need not have been limited to the first floor of Coughlin's residence and that their search was strictly circumscribed by the exigencies that justified its initiation. **Wilmer**, 2018 WL 4537275, at *6.

Finally, it was error for the suppression court to ascribe an ulterior motivation to Officer Sulock's decision to enter Coughlin's residence. In examining a claim brought under the Fourth Amendment, the relevant inquiry is "whether there was an objectively reasonable basis for believing that medical assistance was needed, or persons were in danger[.]" **Ford**, 175 A.3d at 990 (quoting **Fisher**, 558 U.S. at 49).

> An action is "reasonable" under the Fourth Amendment, regardless of the individual officer's state of mind, "as long as the circumstances, viewed *objectively*, justify [the] action." **Scott v. United States**, 436 U.S. 128, 138 (1978) (emphasis added). The officer's subjective motivation is irrelevant. **See Bond v. United**

*States*, 529 U.S. 334, 338, n.2 (2000) ("The parties properly agree that the subjective intent of the law enforcement officer is irrelevant in determining whether that officer's actions violate the Fourth Amendment ...; the issue is not his state of mind, but the objective effect of his actions"); ***Whren v. United States***, 517 U.S. 806, 813 (1996) ("[W]e have been unwilling to entertain Fourth Amendment challenges based on the actual motivations of individual officers"); ***Graham v. Connor***, 490 U.S. 386, 397 (1989) ("[O]ur prior cases make clear" that "the subjective motivations of the individual officers ... ha[ve] no bearing on whether a particular seizure is 'unreasonable' under the Fourth Amendment").

***Brigham City***, 547 U.S. at 404 (internal citations edited).

In its opinion, the suppression court stated, "[T]his [c]ourt did not find it reasonable nor was it credible that Officer Sulock's motivation for entering [Coughlin's] home without a warrant was the belief that someone else was in the residence." Suppression Ct. Op. at 7. Rather, according to the court, Officer Sulock "desire[d] to locate the gun." ***Id.*** However, whether Officer Sulock's actual motivation was to render aid or merely to locate the assault rifle is not a relevant inquiry. The relevant question is whether, considering the totality of the circumstances, it was objectively reasonable for Officer Sulock to enter Coughlin's home. We answer that question in the affirmative, as explained above. Thus, we reject the court's effort to glean the subjective intent of Officer Sulock. ***See, e.g.***, ***Fisher***, 558 U.S. at 49 (rejecting argument that officers "could not have been motivated by a perceived need to provide medical assistance, since they never summoned emergency medical personnel"); ***Brigham City***, 547 U.S. at 404 (rejecting argument that "officers were more interested in making arrests than quelling violence").

Based upon the precedent set forth above, as applied to the circumstances here, we conclude that police had an objectively reasonable basis to enter Coughlin's home without a warrant and to conduct a protective sweep to ensure that no one had suffered a serious injury. As the suppression court erred, both in its findings and its legal analysis, we reverse its decision to suppress the firearm seized from Coughlin's home and remand for further proceedings consistent with this opinion.

Order reversed in part; case remanded; jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/14/18