J-A18005-20

2020 PA Super 218

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
TOD SCHNEIDER :
:
Appellant : No. 830 WDA 2019

Appeal from the Judgment of Sentence Entered May 7, 2019
In the Court of Common Pleas of Venango County Criminal Division at
No(s): CP-61-CR-0000109-2017

BEFORE: BENDER, P.J.E., DUBOW, J., and NICHOLS, J.

OPINION BY BENDER, P.J.E.: **FILED SEPTEMBER 09, 2020**

Appellant, Tod Schneider, appeals from the judgment of sentence of an aggregate term of five years' probation, imposed after a jury convicted him of two counts of aggravated assault, 18 Pa.C.S. § 2702(a)(3), two counts of simple assault, 18 Pa.C.S. § 2701(a)(1), one count of resisting arrest, 18 Pa.C.S. § 5104, one count of possessing a controlled substance, 35 P.S. § 780-113(a)(16), and one count of possessing drug paraphernalia, 35 P.S. § 780-113(a)(32). Appellant challenges the court's denial of his pretrial motion to suppress, as well as the sufficiency of the evidence to sustain his resisting arrest conviction. After careful review, we vacate Appellant's judgment of sentence and remand for a new trial.

Briefly, Appellant was arrested and charged with the above-stated offenses after he fought with police officers who had entered his home without a warrant during a mental health check of Appellant. After Appellant was

arrested and removed from his home, a police officer reentered the residence and observed marijuana and a pipe in plain view, thus leading to his charges for possessory offenses.

Prior to trial, Appellant filed a motion to suppress the drugs and paraphernalia, as well as officers' testimony about his assaultive conduct. In support, he contended that the police had illegally entered his residence without a warrant, and the evidence he sought to suppress was the fruit of that unconstitutional action by police. A suppression hearing was conducted on November 22, 2017. The trial court summarized the facts established at that hearing, as follows:

> Around 4:00 p.m. on January 24, 2017, Oil City Police Department Lieutenant Jonathan Love was approached by Jake Poindexter, a Protective, Intake, and Crisis Unit ("PICS") worker in Venango County, about accompanying him as a safety precaution in conducting a mental welfare check of an individual. That individual was later identified as [Appellant] in the instant matter, who was located at 19 Colbert Avenue in Oil City, Pennsylvania. Mr. Poindexter shared with Lieutenant Love a written report that documented mental health concerns about [Appellant]. Specifically, the report stated that [Appellant] believed he was "Jesus Christ," "Thor," and "Jim Carrey." Lieutenant Love testified at the November 22, 2017 hearing that the PICS Unit has made countless requests such as this, which they refer to as "standbys," in which police officers go with mental health workers to ensure the scene is safe.
>
> As such, Lieutenant Love, along with [Officer] Regina Deloe, accompanied Mr. Poindexter to the 19 Colbert Avenue address. Once there, Lieutenant Love knocked on the front door and [Appellant] answered. Lieutenant Love, having previously interacted with [Appellant] in an unrelated matter, attempted to introduce Mr. Poindexter to [Appellant]. Both Lieutenant Love and [Officer] Deloe testified that [Appellant] seemed friendly at first, but his demeanor quickly changed. While staring at Mr.

- 2 -

Poindexter, [Appellant] stated that Mr. Poindexter's "eyes were fading away and turning black." He then turned to Lieutenant Love and told him to "take off his peashooter," that guns kill people, and that the gun "needs to return to earth from which it came and return to dust." [Appellant] then immediately tried to shut the door. However, Lieutenant Love positioned his foot in between the door and the frame to prevent its closure. Hearing these statements, Lieutenant Love testified that[,] coupled with the allegations he read in the mental health report given to him by Mr. Poindexter, he was concerned that there was a mental health issue with [Appellant] and that they definitely needed to investigate further.

After putting his foot in the doorway, Lieutenant Love proceeded to open the door and stepped inside the living room of the residence. Once there, he attempted to have [Appellant] take a seat in a chair so that he could have a conversation with Mr. Poindexter. While requesting this of [Appellant], Lieutenant Love testified that [Appellant] was chanting incoherent chatter and he was blinking his eyes rapidly. Then, unprovoked, [Appellant] struck Lieutenant Love in the chest with his left hand. Lieutenant Love then proceeded in attempting to physically put [Appellant] in the chair, whereupon a struggle ensued. Lieutenant Love ended up wrestling with [Appellant] for several minutes. During the course of the struggle, [Officer] Deloe used her radio to request another officer to respond. [Appellant] was subsequently tasered twice and pepper sprayed once.

After several minutes, [Appellant] was finally placed in handcuffs and led outside to be placed into a police vehicle. Lieutenant Love testified at the hearing that it was at no time the officers' intention to place [Appellant] into custody before the events of that day transpired, and that their presence was merely for the protection of Mr. Poindexter. Lieutenant Love further testified that he would not have been comfortable leaving the address after his first interaction with [Appellant] when the officers and Mr. Poindexter were still positioned outside the home, and that it was his belief at that time, given his knowledge of the mental health report and [Appellant's] statements, that [Appellant] was in need of immediate medical treatment. However, on cross-examination, Lieutenant Love testified that in the thirty days preceding the incident of January 24, 2017, he personally had not received any complaints regarding [Appellant's] behavior. Furthermore, Lieutenant Love testified

- 3 -

that it was his belief that [Appellant] was a danger to himself or others based upon his interactions with him on that day.

In her testimony given at the November 22, 2017 hearing, [Officer] Deloe corroborated Lieutenant Love's recollection of the events of January 24, 2017[,] and noted that she participates in escorting mental health workers multiple times in a normal week. She further explained that she also believed that [Appellant] was a danger to himself or others. Once [Officer] Deloe left [Appellant's] residence, she realized that one of her gloves that she had been wearing during the struggle with [Appellant] was no longer on her hand. As the residence's door was still ajar from the other officers' exits, she reentered the residence. Upon reentry, [Officer] Deloe immediately saw her missing glove in the area where the struggle with [Appellant] took place.

[Officer] Deloe additionally testified that once inside the residence, she noticed on the floor where an overturned chair once sat, a sandwich baggy containing a leafy green substance she suspected to be marijuana and a pipe used for smoking marijuana. The items were within inches of each other. As such, [Officer] Deloe seized the suspected contraband.

When questioned about the officers' motives and decision to arrest [Appellant], [Officer] Deloe testified that they were not at [Appellant's] residence to arrest him, and that the decision to arrest him was only made after everything had occurred inside the residence. After being placed in a squad car, the officers first took [Appellant] to be arraigned in front of Magisterial District Court Judge Andrew Fish, but upon his recommendation, [Appellant] was subsequently taken to UPMC Northwest for a mental health evaluation.

Trial Court Opinion (TCO), 6/15/18, at 1-4.

Based on this evidence, the trial court concluded that Lieutenant Love reasonably believed that Appellant needed mental health assistance and, therefore, the warrantless entry into Appellant's home was justified by the public servant exception of the community caretaking doctrine, discussed in further detail *infra*. **See id.** at 9. Accordingly, the court denied Appellant's

motion to suppress and his case proceeded to a jury trial on March 21, 2019.

At the conclusion thereof, the jury convicted Appellant of the above-stated

offenses and, on May 7, 2019, he was sentenced to the aggregate term set

forth above.

Appellant filed a timely notice of appeal, and he also complied with the

trial court's order to file a Pa.R.A.P. 1925(b) concise statement of errors

complained of on appeal. The court filed a Rule 1925(a) opinion stating that

it had adequately addressed the issues raised in Appellant's Rule 1925(b)

statement in its June 15, 2018 opinion denying his motion to suppress.

Herein, Appellant states three issues for our review:

> I. Did the trial court err in denying the suppression motion when the police failed to comply with the involuntary commitment requirements under the Mental Health Procedures Act [(MHPA), 50 P.S. §§ 7101-7503,] before charging into [Appellant's] home without a warrant?
>
> II. Did the trial court's erroneous ruling on suppression prejudice [Appellant], thereby entitling him to a new trial?
>
> III. Was the evidence insufficient to prove resisting arrest when the Commonwealth failed to prove beyond a reasonable doubt [that] a lawful arrest [occurred]?

Appellant's Brief at 10 (capitalization and emphasis omitted).

Appellant's first two issues challenge the court's denial of his pretrial

motion to suppress and will be addressed together. Initially, we note:

> An appellate court's standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the

Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, the appellate court is bound by those findings and may reverse only if the court's legal conclusions are erroneous. Where the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to plenary review.

*Commonwealth v. Smith*, 164 A.3d 1255, 1257 (Pa. Super. 2017) (cleaned up).

Here, Appellant sought suppression on the basis that the officers' warrantless entry into his home was illegal. In denying Appellant's motion, the trial court found that the public servant exception of the community caretaking doctrine applied to validate the officers' actions. Our Supreme Court has explained this exception to the warrant requirement, as follows:

Absent a recognized exception, under the Fourth Amendment to the United States Constitution it is axiomatic that a law enforcement officer may not make a warrantless entry into a private dwelling. One such exception to the warrant requirement is the "emergency aid exception," which this Court has characterized as belonging to a broader group of exceptions justified by the "community caretaking doctrine." *Commonwealth v. Livingstone*, … 174 A.3d 609, 627 ([Pa.] 2017). Pursuant to the community caretaking doctrine, certain warrantless actions of police officers do not offend constitutional principles because they are motivated by a "desire to render aid or assistance, rather than the investigation of criminal activity." *Id.* at 627.

*Commonwealth v. Wilmer*, 194 A.3d 564, 565 (Pa. 2018) (footnote omitted). The *Wilmer* Court continued:

> In our recent decision in *Livingstone*, this Court observed that the community caretaking doctrine encompasses three specific exceptions to the Fourth Amendment's warrant requirement: the public servant exception, the automotive impoundment/inventory exception, and the emergency aid exception. *Livingstone*, 174 A.3d at 626-27. These three exceptions share a common underpinning, namely that police officers engage in a wide variety of activities relating to the health and safety of citizens unrelated to the detection, investigation and prevention of criminal activity. *Livingstone*, 174 A.3d at 627 [(citation omitted)]. We also stressed in *Livingstone*, however, that while community caretaking activities are laudable endeavors, they must be performed strictly in accordance with Fourth Amendment protections. *Id.* at 629.

*Id.* at 568–69 (footnotes omitted).

In *Livingstone*, the Court more specifically explained that,

> in order for a seizure to be justified under the public servant exception to the warrant requirement under the community caretaking doctrine, the officer must point to specific, objective, and articulable facts which would reasonably suggest to an experienced officer that assistance was needed; the police action must be independent from the detection, investigation, and acquisition of criminal evidence; and, based on a consideration of the surrounding circumstances, the action taken by police must be tailored to rendering assistance or mitigating the peril. Once assistance has been provided or the peril mitigated, further police action will be evaluated under traditional Fourth Amendment jurisprudence.

*Livingstone*, 174 A.3d at 637.

In this case, Appellant focuses on challenging the trial court's conclusion that the first prong of the *Livingstone* test was met in this case, *i.e*, that Lieutenant Love articulated sufficient facts to demonstrate that he reasonably believed Appellant needed assistance when he entered his home without a

warrant. In finding this prong of the *Livingstone* test met, the trial court

stated:

> On January 24, 2017, Lieutenant Love was forced to make a split-second judgment as to whether he should allow Mr. Poindexter's interactions with [Appellant] to cease, or prevent [Appellant] from shutting his front door so that the mental health welfare check could continue. Armed with a written report concerning mental health concerns about [Appellant], and his personal observations of [Appellant's] odd behavior, Lieutenant Love erred on the side of caution in keeping the door open and entering into the residence to facilitate furthering Mr. Poindexter's examination of [Appellant]. As the officers knew [Appellant] was located inside the residence, and given all of the information available to them at the time, they both believed [Appellant] was a danger to himself or others, and therefore needed further evaluation by Mr. Poindexter. Consequently, we conclude there was an objectively reasonable basis for them to believe that an occupant of the residence was in need of immediate medical treatment, and may very well have been a danger to himself or others. As such, we find that the warrantless entry into [Appellant's] residence was reasonable based upon the officers' reasonable belief that [Appellant] was in need of immediate aid.

> In analysis of the facts at hand, we find that the first prong of the public servant exception of the community caretaking doctrine[,] set forth in *Livingstone*, is met. Lieutenant Love and Patrolwoman Daloe both credibly testified that they are regularly called upon by mental health professionals in the community to assist in mental health welfare checks of Oil City residents. Additionally, both officers testified that on January 24, 2017, Lieutenant Love was approached in person by Mr. Poindexter in the hope that the officers would accompany him as a safety precaution in conducting a mental welfare check on [Appellant].

> Combined with the written report provided by Mr. Poindexter, both officers credibly testified that upon making initial contact with [Appellant] at the door of his residence, both felt he was a danger to himself or others, and that they would not have been comfortable leaving his house without further evaluation by Mr. Poindexter as to [Appellant's] mental status. Therefore, in analyzing all of the information available to the officers on January 24, 2017, the [c]ourt finds that the objective facts would have

reasonably suggested to an experienced officer that their assistance was required in facilitating a mental welfare check of [Appellant].

TCO at 10-11.

On appeal, Appellant urges us to conclude that the facts testified to by Lieutenant Love were insufficient to reasonably suggest that Appellant needed assistance, or that he posed a danger to himself or anyone else. He explains:

The mental health report the police relied on was not presented at the suppression hearing and no one testified with any first-hand knowledge regarding the allegations in the report. The only competent evidence presented at the suppression hearing regarding why the police forced themselves into his home was [Appellant's] statement that Mr. Poindexter's eyes looked black and were fading away, his opinion that guns killed people and should go back to the earth, and his referral to guns as peashooters. At that point, [Appellant] stepped back into his home and tried to close the door. Lieutenant Love stopped him from closing the door and the police went inside [Appellant's] residence.

***

[Appellant's] statements during twenty seconds to one minute of police interaction on the porch do not provide an objective basis to reasonably suggest that assistance was needed for the community caretaker function to apply. This is especially true considering that [Appellant] seemed fine. The police confirmed that they received no complaints regarding [Appellant's] behavior within the previous thirty days, he was dressed and groomed, the electricity was on at his home, there were no indications that he was malnourished, there were no reports that he had a weapon, he did not make any threatening gestures towards authorities on the porch, there was no indication that he had attempted suicide or had mutilated himself, and there were no reports of any people in the home that were in danger. The surrounding circumstances presented nothing to reasonably suggest that [Appellant] required assistance or was in immediate peril to the point that the police needed to force their way into his home.

- 9 -

Appellant's Brief at 42-43.

Appellant also contends that no facts supported Lieutenant Love's and Officer Deloe's conclusions that Appellant was a danger to himself or others at the point they entered his home. He stresses that, unlike prior cases upholding warrantless actions by police based on the community caretaking exception, here, "there was no indication that [Appellant] possessed or recently used a weapon, [he] was not actively engaged in activity that could harm himself or another person, there was no visible bodily injury to [Appellant] or anyone else, there were no reports of shots fired, and there was no indication of danger to another person in the residence." *Id.* at 46 (citing *Commonwealth v. Coughlin*, 199 A.3d 401 (Pa. Super. 2018) (*en banc*) (finding exigent circumstances existed for a warrantless entry and protective sweep of a home, where officers responded to reports of a suspect firing assault rifle in neighborhood known for gun violence and the suspect gave inconsistent answers as to whether anyone else was inside home); *Commonwealth v. Edwards*, 194 A.3d 625, 635 (Pa. Super. 2018) (concluding "that police acted reasonably and pursuant to the community caretaking doctrine when observing [Edwards] limping, with a bloody leg, at 1:20 a.m., in that they approached and offered [Edwards] medical assistance")). For all of these reasons, Appellant claims that the facts known to the officers when they entered his home without a warrant did not reasonably suggest that he needed police assistance at that time and,

therefore, the public servant exception of the community caretaking doctrine did not apply.

Initially, we note that Appellant is correct that the mental health report reviewed by Lieutenant Love prior to the incident was not entered into evidence at the suppression hearing. However, Lieutenant Love testified about the statements by Appellant detailed in that report — specifically, that Appellant believed he was "Jim Carrey, Thor, and Jesus Christ" — during Appellant's cross-examination of the lieutenant. *See* N.T. Suppression Hearing, 11/22/17, at 30. Because Appellant elicited the testimony about his statements in the report, he cannot now object to the court's consideration of that evidence in assessing if the public servant exception applied.

Nevertheless, even considering those comments, we agree with Appellant that the facts known to Lieutenant Love when he entered Appellant's home without a warrant were not sufficient for the lieutenant to reasonably believe that Appellant required immediate assistance. Certainly, Appellant's statements in the mental health report, and to the officers on the porch of his residence, were odd. However, none of his remarks were threatening, combative, or violent, and Officer Deloe testified that Appellant made no threatening gestures during the 20 to 30 second interaction the officers had with him on his porch. *See* N.T. Suppression Hearing at 51. Furthermore, Appellant's statements did not indicate an intent to hurt himself or anyone else, and there was no indication that he had a weapon or that anyone else was inside his residence. *Id.* Moreover, both officers testified that Appellant

- 11 -

was dressed, he did not look hurt or malnourished, and nothing indicated that he was suicidal or inclined to harm himself. *Id.* at 29, 30-31, 51. Accordingly, we agree with Appellant that these facts do not demonstrate that Lieutenant Love reasonably believed that Appellant required immediate assistance because he posed a danger to himself.

Instead, the record indicates that Lieutenant Love made the decision to enter Appellant's home because he reasonably believed that *further investigation* of Appellant's mental health was necessary. The Pennsylvania Supreme Court's decision in *Livingstone* demonstrates that the Court did not intend the public servant exception to permit an officer to enter an individual's home without a warrant simply to 'investigate' if that person needs assistance. In *Livingstone*, a Pennsylvania State Trooper activated his emergency lights and pulled alongside Livingstone's vehicle, which was parked on the side of an interstate highway at 9:30 p.m., to "see if she needed assistance." *Livingstone*, 174 A.3d at 638. The Court concluded the trooper had seized Livingstone, and it then held that, although the trooper's intention was truly to assist her, his warrantless seizure was not validated by the public servant exception. The Court reasoned that the trooper "was unable to articulate any specific and objective facts that would reasonably suggest that [Livingstone] *needed* assistance." *Id.* (emphasis added). The Court noted that the trooper had

> conceded that he had not received a report of a motorist in need of assistance, and did not observe anything that outwardly suggested a problem with [Livingstone's] vehicle. Moreover,

- 12 -

although it was dark, the weather was not inclement. Finally, [Livingstone], who was inside her vehicle, did not have her hazard lights on.

*Id.* In sum, because the facts did not establish that Livingstone actually needed assistance, the trooper's warrantless seizure of Livingstone to ascertain if she needed help was not permitted under the public servant exception of the community caretaking doctrine.

The same is true in the present case. As discussed *supra*, nothing in Appellant's demeanor, statements, outward appearance, or condition of his residence indicated that he needed police assistance, or that he posed a danger to himself or others. Thus, Lieutenant Love's entering his home without a warrant to further investigate whether assistance was required was not lawful under the public servant exception, as defined and applied in *Livingstone*.

Finally, we also agree with Appellant that Lieutenant Love did not validly enter his home to involuntarily commit him pursuant to the MHPA. Under 50 P.S. § 7302(a)(2), a person may be seized without a warrant and taken to a facility for an emergency examination if an officer personally observes "conduct of a person constituting reasonable grounds to believe that he is severely mentally disabled and in need of immediate treatment…." Section 7301 states that "[a] person is severely mentally disabled when, as a result of mental illness, his capacity to exercise self-control, judgment and discretion in the conduct of his affairs and social relations or to care for his own personal needs is so lessened that he poses a clear and present danger of harm to

- 13 -

others or himself, as defined in subsection (b), or the person is determined to be in need of assisted outpatient treatment as defined in subsection (c)." 50 P.S. § 7301(a). A person presents a "clear and present danger" to himself or others if, within the past 30 days, he has shown that he cannot satisfy his own need for nourishment, personal or medical care, shelter, or safety; he has attempted or threatened suicide or there is a reasonable probability he will commit suicide; or he has mutilated himself or attempted or threatened to do so. 50 P.S. § 7301(b)(2)(i)-(iii).

As set forth above, Appellant's statements did not reasonably indicate that he had inflicted or attempted to inflict harm upon himself or anyone else, or that he posed a suicide risk. Additionally, there were no reports that Appellant possessed a gun; indeed, Appellant's statements to Lieutenant Love indicated that he was opposed to firearms in general. Lieutenant Love and Officer Deloe both testified that Appellant was dressed and appeared nourished, and that he was living in a home that had electricity. They also did not observe any injuries to Appellant.

These facts make the instant case easily distinguishable from the case cited by the Commonwealth, *In re J.M.*, 726 A.2d 1041 (Pa. 1999). There, officers had received multiple reports concerning J.M.'s mental health, including a report that J.M. had a gun. *Id.* at 1050. J.M. also made delusional and paranoid comments to the officers when they arrived at her home, and the officers could see that she was "disheveled with a contusion to her right eye[,]" which she refused to explain. *Id.* Rather than enter J.M.'s home

- 14 -

without a warrant, as the officers did in this case, the officers in *J.M.* obtained a warrant under section 7302 of the MHPA for the emergency medical examination of J.M. *Id.* at 1044. When the officers returned to execute the warrant, J.M. again refused to permit them to enter her home, and she threatened to shoot herself and her adult son who lived with her. *Id.* At that point, the officers forcibly entered her home and found J.M. pointing a loaded gun at them. *Id.* at 1051. Our Supreme Court held that not only was the warrant to seize J.M. supported by reasonable grounds to believe that she was severely mentally disabled and in need of immediate treatment, but even had the warrant not been valid, the officers had lawfully entered her home under section 7302(a)(2), as J.M. had threatened to shoot herself and her son. *Id.* at 1050-51.

The facts of *J.M.* obviously do not control the present case. Most notably, there was no report that Appellant had a weapon, Appellant made no threats to himself or anyone else, and he had no visible injuries. Accordingly, unlike in *J.M.*, the facts did not provide reasonable grounds for Lieutenant Love to conclude that Appellant was severely mentally ill and in need of immediate medical treatment, such that the officers could forcibly enter his home without a warrant.

In sum, we conclude that Lieutenant Love's and Officer Deloe's warrantless entry into Appellant's home was not justified under either the public servant exception of the community caretaking doctrine, or the involuntary commitment procedures of the MHPA. The officers did not state

sufficient facts to establish that Appellant was in need of immediate assistance at the time the officers entered his home. The officers' intent to further investigate whether assistance was necessary was not sufficient grounds under **Livingstone** to permit them to force their way into Appellant's residence without a warrant. Additionally, the MHPA's criteria for an involuntary commitment without a court order were not met in this case. Consequently, the trial court erred by concluding that the officers lawfully entered Appellant's residence.

Next, we must assess whether, based on this illegal entry, the trial court should have suppressed the particular evidence challenged by Appellant. In his motion to suppress, Appellant claimed that because the officers unlawfully entered his home, "all police action inside is fruit of the poisonous tree and must be suppressed." Appellant's Motion to Suppress, 1/22/18, at 13. Specifically, he requested that the court suppress the drugs and paraphernalia found inside his home, and "bar any testimony from law enforcement regarding the physical interaction with [Appellant]…." **Id.**

In **Wong Sun v. United States**, 371 U.S. 471, 488 (1963), the United States Supreme Court held that evidence constitutes poisonous fruit, and, thus, must be suppressed, if, "granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." In interpreting **Wong Sun** and its progeny, the Pennsylvania Supreme Court has clarified that,

- 16 -

[t]he general rule excludes all evidence unlawfully seized, and this extends to the direct and indirect products of the illegality. Moreover, excludable evidence includes proof that is tangible and physical materials, items observed, words overheard, confessions or statements made by the accused, and eyewitness identification testimony.

Further, there is no *per se* ban on the admission of all evidence resulting from unlawful law enforcement conduct. Rather, an inquiry must be made into the source of the evidence as well as any potential tainting of the evidence due to unconstitutional actions by police. Any evidence that comes solely as a result of illegal conduct is tainted fruit, and is not admissible. Conversely, the mere fact that certain evidence was obtained illegally does not necessarily bar evidence based upon an earlier, lawful viewing. Evidence whose origin is wholly independent of unconstitutional action by law enforcement is admissible. However, even evidence that originates prior to illegal conduct may be impacted by these unconstitutional actions, as those actions can affect the reliability of the evidence at trial or render it inadmissible.

***Commonwealth v. Santiago***, 209 A.3d 912, 928 (Pa. 2019).

In this case, we initially observe that Lieutenant Love's and Officer Deloe's testimony about Appellant's conduct once they were inside his home does not clearly fall into any of the categories of 'excludable evidence' discussed in ***Santiago***. The officers were not testifying about any tangible or physical material, item observed, words overheard, eyewitness identification, or confession or statement by Appellant. Instead, they were describing Appellant's actions in assaulting Lieutenant Love and resisting the officers' subsequent efforts to arrest him.

Moreover, we cannot conclude that Lieutenant Love's and Officer Deloe's testimony about Appellant's assault of the officers was evidence that was "come at by exploitation of th[e] illegality" of the officers' illegal entry into

- 17 -

Appellant's home. Lieutenant Love did not immediately arrest Appellant once he was inside the residence. Instead, the lieutenant simply asked Appellant to sit down, and then tried to talk to Appellant. N.T. Suppression Hearing at 14. Appellant replied in "incoherent chatter" and "was blinking his eyes really fast…." *Id.* Then, without any "advance warning[,]" Appellant suddenly "lunged out" at the lieutenant and "jab[bed the officer] in the chest." *Id.* at 14, 16, 33. Appellant continued to struggle as Lieutenant Love again attempted to have him sit in a chair, and he ultimately fought the lieutenant and the other officers trying to subdue him, to the extent that he had to be tasered and pepper sprayed to be contained.

We agree with the Commonwealth that the officers' entry into Appellant's home, albeit illegal, did "not give Appellant a free pass to commit the assaults he did upon the officers," and that Appellant's actions in this regard "constituted a new tree of criminal conduct." Commonwealth's Brief at 23. While we certainly do not condone the officers' unconstitutional entry of Appellant's home, we also cannot condone Appellant's surprise attack on Lieutenant Love, or his combative response when the officers tried to subdue him. Appellant's conduct was not in response to Lieutenant Love's exploiting the illegality of his presence in Appellant's home. Accordingly, the lieutenant's and Officer Deloe's testimony about Appellant's actions was not suppressible as fruit of the poisonous tree.

On the other hand, the drugs and paraphernalia found by Officer Deloe were at least indirectly tied to the officers' illegal entry of Appellant's home.

For instance, had Appellant's assault of the officers and subsequent arrest happened on his porch, Officer Deloe would have never been inside Appellant's home to see the drugs and paraphernalia in plain view. Thus, it was only due to Lieutenant Love's initial illegal entry that Officer Deloe ultimately observed the drugs and paraphernalia in the area where the scuffle between the officers and Appellant occurred. Therefore, the drugs and paraphernalia should have been suppressed as fruit of the poisonous tree of the officers' unconstitutional entry of Appellant's residence.

Accordingly, we conclude that the trial court erred by finding that Lieutenant Love lawfully entered Appellant's home. Because that warrantless entry was illegal for the reasons set forth *supra*, the drugs and paraphernalia seized from Appellant's residence should have been suppressed. The testimony concerning Appellant's assault on the officers, however, was admissible, as Appellant's actions separated his conduct from the initial illegal entry by police. Nevertheless, we agree with Appellant that he was prejudiced by the jury's being informed that the officers were lawfully inside his home. The jury considered this incorrect fact when assessing the officers' testimony and credibility, and in deciding whether Appellant's conduct met the elements of the offenses with which he was charged. Appellant was also precluded from presenting an argument (whether valid or not) that he acted in self-defense or was justified in his actions. Accordingly, we vacate Appellant's judgment of sentence and remand for a new trial, at which the drugs and paraphernalia shall be excluded, the jury will be informed that the officers were unlawfully

inside Appellant's residence, and Appellant can frame his defense around that fact.

Notwithstanding this disposition, we must address Appellant's third issue, in which he maintains that the evidence was insufficient to convict him of resisting arrest, thus precluding his retrial for that offense. To begin, we note our standard of review of a challenge to the sufficiency of the evidence:

> In reviewing a sufficiency of the evidence claim, we must determine whether the evidence admitted at trial, as well as all reasonable inferences drawn therefrom, when viewed in the light most favorable to the verdict winner, are sufficient to support all elements of the offense. *Commonwealth v. Moreno*, 14 A.3d 133 (Pa. Super. 2011). Additionally, we may not reweigh the evidence or substitute our own judgment for that of the fact finder. *Commonwealth v. Hartzell*, 988 A.2d 141 (Pa. Super. 2009). The evidence may be entirely circumstantial as long as it links the accused to the crime beyond a reasonable doubt. *Moreno, supra* at 136.

*Commonwealth v. Koch*, 39 A.3d 996, 1001 (Pa. Super. 2011).

The crime of resisting arrest is defined as follows:

> A person commits a misdemeanor of the second degree if, with the intent of preventing a public servant from effecting a lawful arrest or discharging any other duty, the person creates a substantial risk of bodily injury to the public servant or anyone else, or employs means justifying or requiring substantial force to overcome the resistance.

18 Pa.C.S. § 5104. As Appellant observes, our Supreme Court has held that "in order to be convicted of resisting arrest, the underlying arrest must be lawful." *Commonwealth v. Biagini*, 655 A.2d 492, 497 (Pa. 1995) (citation and emphasis omitted). "A determination of the lawfulness of the underlying

arrest necessitates a legal conclusion that the arresting officer acted with authority and probable cause." *Id.* (citation omitted).

In the present case, Appellant avers that "[t]he police had no legal justification for the warrantless entry into [his] home[,]" and "[a]s such, the police were not lawfully discharging their duties when arresting [Appellant] after illegally entering his home." Appellant's Brief at 61. We disagree. Appellant's argument would carry more weight if Lieutenant Love had immediately arrested him upon illegally entering his home. However, that is not what occurred. Appellant was arrested only after he shoved and assaulted Lieutenant Love and the other officers trying to subdue him. Appellant's conduct unequivocally provided the officers with probable cause to arrest him for assault. Appellant provides no legal authority to support his position that, regardless of his attack on the officers, they had no legal authority to arrest him simply because they had unlawfully entered his residence. By this rationale, Appellant could not have been lawfully arrested even had he shot and killed Lieutenant Love. This argument is meritless. Appellant's physical assault of the lieutenant provided probable cause to arrest him and, thus, his arrest was legal. Consequently, Appellant's challenge to the sufficiency of the evidence to sustain his resisting arrest conviction fails, and he may be retried for that offense.

Judgment of sentence vacated. Case remanded for further proceedings. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>9/9/2020</u>